[Civ. No. 22798. First Dist., Div. Three. Mar. 10, 1966.]

JEANNE A. MARLOW, Plaintiff and Appellant, v.
FRANCES WENE, Defendant and Respondent.

Thomas, James & Pendleton and Douglas H. Pendleton for Plaintiff and Appellant.

Pestarino, Winningham & Menard and Lawrence A. Menard for Defendant and Respondent.

DEVINE, J.—A prolonged struggle for the custody of a girl has gone on between appellant, the child's mother, and respondent, appellant's mother, the grandmother of the girl. The father, who at an earlier proceeding in Tennessee had supported the grandmother, filed an answer in the present proceeding in which he supports the claim of appellant, the child's mother, his own former wife.

Mrs. Marlow, appellant, has been a resident of California since 1963. She was married to Harry Hutcherson in 1950. Of this marriage twin daughters were born on June 3, 1951. One of the girls resides with the grandmother and there is no contest about her. The other, Melissa Diane Hutcherson, is the subject of the proceeding. It is unnecessary to give the long history of appellant's marriages (six, including two to Hutcherson), nor that of the strained relationship with respondent, who also was divorced, from appellant's father. Suffice it to say that in 1958, while appellant was in Florida with her children, who were lawfully in her custody under the Hutcherson decree of divorce, respondent, the grandmother, took the children as they came from school and brought them to her home in Nashville, Tennessee. No warning was given to appellant. She suffered for some hours the terrors of a parent whose children are missing. She then learned who had taken the children.

Respondent petitioned the Tennessee court for custody of the children. Appellant was present, but she testified in the present proceeding that it was her understanding that the judge made a temporary order only and that he said he would review it in six months or a year. This was in May, 1959. Actually, the Tennessee decree recites that *"the solicitors of the respective parties* [appellant and respondent herein] *are in agreement* that the minor children, Melissa Hutcherson and

Melinda Hutcherson, should, *at the present time,* be left in the home of Mrs. W. L. Wene and . . . that this custody arrangement *at the present time* seems to be to the best interest of the minor children." (Italics supplied.) Appellant was permitted visitation of the children at respondent's home. Appellant returned to Florida. She married a man in military service and went to Spain. After divorce, she married again and came to California.

Appellant saw her twin daughters at least once a year and wrote to them with some regularity. In November 1963, appellant received a letter from her daughter Melissa, saying that Melissa was unhappy at her grandmother's home. From this letter, from subsequent communications, and from Melissa's testimony, it appears that her complaints were that her grandmother, Mrs. Wene, did not do any housework, or keep the house in repair, that Melissa and her sister had to do all the housework, that there were insects in the kitchen and the basement, that Mrs. Wene and her husband did not get along and in fact often did not speak, that the girls were used as go-betweens by their grandparents, and that Mrs. Wene was very strict with Melissa and constantly criticized her for being too much like her mother. At Christmas time, 1963, Mrs. Marlow visited her daughters in Tennessee. At that time Melissa stated that she very much wanted to go with her mother to live in California. After appellant returned to California, she continued to receive letters from the girls. The tenor of the communications was the same as before. Melissa wanted to leave Tennessee and come to California to live with Mrs. Marlow. Melinda thought she wanted to come also, but she was not sure.

Appellant testified that she intended to go to Tennessee and take the girls at the end of the 1964 school year. Before that time, however, she began to hear reports of racial unrest and violence in Nashville. Appellant testified that Mrs. Wene was a rabid segregationist and that she was afraid Mrs. Wene would involve the girls in some sort of trouble relating to the racial situation. The children had been sent away from home because of a bomb scare at school. Therefore, appellant testified, she resolved to get her daughters as soon as she could. She testified that she believed her taking of the children was not against the law because the F.B.I. had told her it was not against the law when the grandmother had done the same thing to her. She testified that she thought there would be no problem of

her retaining custody, ''just a natural law of being my children.'' On May 18, 1964, appellant went to Tennessee, secretly took her daughters from the custody of Mrs. Wene, and brought them to San Jose. Shortly after this, appellant was arrested in California on a kidnaping charge pursuant to a warrant issued by the Tennessee authorities on the complaint of respondent, Mrs. Wene. Mrs. Marlow was released after spending a night in the county jail in Santa Clara. Subsequently, Tennessee sought extradition. It was denied by the Governor of California after a hearing.

On May 29, 1964, appellant filed a complaint for custody. Melinda voluntarily returned to Tennessee to live with her grandmother, respondent Mrs. Wene. Mrs. Marlow's claims in regard to Melinda were then dropped. Mrs. Wene answered the complaint alleging that it is in the best interest of the child that she be returned to her and that Mrs. Marlow, the mother, is not entitled to have a reexamination on the merits because of the abduction to California. Following judgment for respondent, writ of supersedeas prevented removal of Melissa.

We proceed to analyze separately the possible bases for the judgment. Inevitably, there is some overlapping of the deliberations.

### 1. *Full faith and credit*

The court's conclusions of law are two: (1) that ''Full faith and credit *must be* given to the decree of the Chancery Court of Davidson County, Tennessee,'' and (2) that ''Legal custody of the said minor children, MELISSA HUTCHERSON and MELINDA HUTCHERSON, *is* in the defendant, FRANCES WENE.'' (Italics supplied.) The second of these does not purport to make a present and independent award of custody, but appears to recognize a continuing right of respondent deriving from the Tennessee decree, which the judge concluded he must recognize. The judgment, as well as the conclusions, states that full faith and credit must be given to the Tennessee decree.

Besides this persuasive internal evidence that the judge rested his decision on the constitutional mandate, there is extrinsic evidence that he did so in this: at the end of the hearing the judge asked respondent's attorney if he could stipulate, by consent of respondent's counsel in Tennessee, that Melissa could stay in California until the end of the school year. Tennessee counsel refused to stipulate, and the judge

ordered almost immediate return of the child. If the judge had not deemed himself bound by the Tennessee decree, he need not have made such a request nor heeded its denial. The judge evidently believed his judicial power to be restrained by the supreme law of the land, and he acted to comply with its formidable mandate.

It appears that the decision in favor of full faith and credit was made upon the proposition that "the trial court had no jurisdiction to affect custody of the minor child" because of "the court's recognition of the principle of full faith and credit provided in Article IV, Section 1, of the United States Constitution." (The quotations are from respondent's reply brief.) But we conclude that in this case the full faith and credit clause did not require the court so to act. The United States Supreme Court has expressly reserved the question whether full faith and credit must ever be given in a child custody case. (*Kovacs* v. *Brewer*, 356 U.S. 604 [78 S.Ct. 963, 2 L.Ed.2d 1008] ; *Ford* v. *Ford*, 371 U.S. 187 [8 S.Ct. 273, 9 L.Ed.2d 240].) But in *New York* ex rel. *Halvey* v. *Halvey*, 330 U.S. 610 [67 S.Ct. 903, 91 L.Ed.1133], it was held that where the custody decree of a state is modifiable under that state's law, a sister state has as much leeway to disregard the decree, to qualify it, or to depart from it as does the state where it was rendered. Modification is permissible under the law of Tennessee. (Tenn. Code Ann., § 36-828.)

In fact, modification of custody decrees is permitted and sometimes demanded, everywhere, when there has been a substantial change of circumstances. (Goodrich, Conflict of Laws (4th ed.) p. 273.) In particular, it is allowable in California. (*Sampsell* v. *Superior Court*, 32 Cal.2d 763 [197 P.2d 739] ; *Titcomb* v. *Superior Court*, 220 Cal. 34 [29 P.2d 206] ; *Heilman* v. *Heilman*, 122 Cal.App.2d 771 [226 P.2d 148] ; *Stout* v. *Pate*, 120 Cal.App.2d 699 [261 P.2d 788], cert. den. 347 U.S. 968 [74 S.Ct. 776, 98 L.Ed. 1110].) The same principle is recognized in Tennessee (*Dearing* v. *Dearing*, 50 Tenn.App. 394 [362 S.W.2d 45] ; *State* ex rel. *French* v. *French*, 182 Tenn. 606 [188 S.W.2d 603] ; *Kenner* v. *Kenner*, 139 Tenn. 211 [201 S.W. 779, L.R.A. 1918E 587].)

The judge made no finding, although it was proposed by appellant that he do so, on the subject of change of circumstances. As suggested by appellant, the changes (all of which find support in the almost, if not entirely, uncontradicted evidence) are that the children's father had joined with the

grandmother in the Tennessee proceeding, but in the California court agrees that appellant should have custody; that in 1959 appellant was having financial difficulties and had been compelled to take a job as cocktail waitress, but now has a position as an insurance broker's office manager; that in 1959 appellant had been changing her residence but later had become a permanent resident of Santa Clara County; that in 1959 Melissa apparently had not made an expression of preference but at the hearing below she definitely expressed a wish to remain with her mother; that Melissa had become unhappy at her grandmother's home. A probation officer of Santa Clara County testified that Melissa and her mother live in a ''warm, congenial atmosphere,'' that the physical surroundings are more than adequate, that Melissa's school grades are good, that she does voluntary librarian work, and that she wishes to stay with her mother. Melissa herself testified that she loves her mother, that her mother has nobody but her, that she is on the honor roll at school, that she did not get along very well with her grandmother.

It is our opinion that at least two of the changed circumstances, and these the most important, namely, the change of the father's position from that favoring the grandmother to that supporting the mother, and the outright expression of preference for the mother by Melissa, are of such consequence as to have required the trial judge to have proceeded on the merits (prescinding at this point from the subject of ''clean hands''). But there is another reason why the judge was not bound either by the full faith and credit doctrine or by comity to decline to consider modification of the Tennessee decree, and it is that the decree was made upon stipulation of the parties. It has been held that no showing of changed circumstances need be made where the original decree was upon stipulation because the primary question, the fitness of the parent, has never really been litigated or decided. (*Coil* v. *Coil,* 211 Cal.App.2d 411, 417 [27 Cal.Rptr. 378] ; *Feist* v. *Feist,* 236 Cal.App.2d 433 [46 Cal.Rptr. 93].) This is of particular importance, we believe, in California because of the policy in this state that custody shall not be awarded to anyone other than a parent unless there is a finding of unfitness of the parent. (*Stewart* v. *Stewart,* 41 Cal.2d 447, 451-452 [260 P.2d 44] ; *Stever* v. *Stever,* 6 Cal.2d 166 [56 P.2d 1229] ; *Guardianship of Clark,* 217 Cal.App.2d 808, 810-811 [32 Cal.Rptr. 111] ; *Shea* v. *Shea,* 100 Cal.App.2d 60 [223 P.2d 32].)

## 2. The doctrine of "clean hands"

Respondent relies also on the theory that appellant came to court with unclean hands, and in particular on *Leathers* v. *Leathers*, 162 Cal.App.2d 768 [328 P.2d 853]. In the *Leathers* case, a wife had commenced an action for divorce in Illinois, the domicile of the family, and had abducted the children. The Illinois decree awarded custody, by the cross-complaint, to the husband. The California court reversed an order which awarded custody to the wife pendente lite, on the ground that she had entered the court with "unclean hands" (p. 775).

In the case at bench, the court finds that "plaintiff JEANNE A. MARLOW is a person with 'unclean hands', and that her misconduct does not entitle her to the aid of this Court according to the doctrine set out in *Leathers* v. *Leathers* (1958) 162 Cal.App.2d 768 [328 P.2d 853]." But this does not appear among the conclusions of law, nor is it mentioned in the judgment. Full faith and credit is the heart of the conclusions and the judgment. ▆▆ The "clean hands" theory, as applied in a custody case, is not an absolute. It is not a constitutional mandate. It is to be applied or not applied at the court's discretion in a particular case. (*In re Walker*, 228 Cal.App.2d 217, 226 [39 Cal.Rptr. 243].)

▆▆ If, then, the judge deemed the supreme law to govern, as the conclusions of law would indicate, he denied himself a discretion which in truth he had. If, however, we assume that the judge relied on the "clean hands" doctrine as an alternate basis for his decision, we conclude that this doctrine cannot support the judgment because of a lack of finding that appellant's taking of the children from Tennessee was done in bad faith, or by fraud, or in gross violation of the Tennessee decree. (See *Crabtree* v. *Superior Court*, 197 Cal. App.2d 821, 829 [17 Cal.Rptr. 763].) There is mention of appellant's "misconduct"; we do not regard this as sufficient without specification. ▆▆ An act contrary to the decree might be technical misconduct and yet not be enough, in the absence of wrongful intent, to deprive the mother of a custody which both father and daughter wish her to have. Not every wrongful act, not even every fraud, prevents a suitor in equity from obtaining relief. His misconduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief. (*Tinney* v. *Tinney*, 211 Cal.App.2d 548, 555 [27 Cal. Rptr. 239].) Respondent's answer designates but one allega-

tion of wrongful intent, namely, that appellant brought the children to California for the purpose of filing the present complaint in a more favorable forum. There is no finding on this allegation. Appellant testified that she did not think it would be necessary to file a custody action in California because of her natural right, and that she first saw a lawyer about it after her arrest.

The general finding that she is a person with unclean hands (which seems to be a conclusion of law) does not suffice. Perhaps the findings would be sufficient in a case in which it would clearly appear without doubt that a party had deliberately violated the decree of another state. But in the case before us, there is no demonstrable flouting of a judgment. The Tennessee decree was not of such character as to have impressed appellant that it was absolute or permanent even if it had been served on her, and she testified that it had not been served. It recites that it is based on stipulation between the parties; its terms are essentially temporary and there is not in it even the common reference to its remaining "until further order of the court"; it is relatively tentative in referring to what "seems to be" to the best interest of the children; it was obtained after an abduction by the grandmother; it does not, as do many custody decrees, forbid removal of the children from the state by the parent; it contains no finding that the mother is unfit to have custody of her children. This being the nature of the decree, it would not be unreasonable for the court to give credence to all or some of appellant's testimony that she thought she had a natural right as their mother to remove the children; that she regarded the decision of the court, as she heard it from the bench, as being something of but temporary effect; that she did not regard it illegal to remove the children because respondent had done this very thing with impunity. There was also her testimony (lacking in most "clean hands" cases) that the impetus for change had come from her daughter Melissa. We do not say that the trial judge would have had to accept any of appellant's testimony, but that he should have resolved the problem by a definite finding, and that the question was not settled by *Leathers* v. *Leathers, supra,* 162 Cal.App.2d 768, which we proceed to analyze.

Features distinguishing the *Leathers* case from our case are: (1) In *Leathers,* there had been an outright award of custody of the children to the father, in which all rights of visitation were denied to the mother until further order of the court

(pp. 770-771); the mother, by fraud and deceit, had obtained custody by a promise that she would return the children the next day and had spirited them away to California (p. 770). In the present case, the Tennessee decree is, as stated above, temporary and rather inconclusive. (2) In *Leathers,* the Illinois court had found the wife to be adulterous, of bad moral character, and totally unfit to have custody of the children. The Tennessee court made no finding of unfitness in the present case. (3) In the California hearing of *Leathers,* the mother made no showing that she was a fit person to have custody, the Illinois court not two months before having found her unfit by virtue of her bad moral character and neglect of her children, and made no showing of change of circumstances (p. 773). (4) In our case, the fact that appellant is the mother who urges her primary claim not against the father, but against a grandmother. This factor has often been recognized by the courts in this type of case. (Ehrenzweig, Conflict of Laws, p. 297.) (5) The earlier abduction in our case by the person who now would apply the "clean hands" concept against the one who did the very thing she had done. (*In re Walker, supra,* 228 Cal.App.2d 217; *Moniz* v. *Moniz,* 142 Cal. App.2d 527 [298 P.2d 710].) (6) The fact that Illinois concededly was the family domicile in *Leathers.*

Since respondent cites no other case than that of *Leathers,* we shall not undertake to cite others in which modification of custody decrees has been denied on the "clean hands" doctrine (sometimes without referring to it by this name) and to give the distinctions between them and the case at bench. Generally, it may be said that in every one of them there was a palpable defiance of the judgment of another state, and there was no change of circumstances except removal itself of the child from the other state.

Should the case be remanded for the court now to determine the facts essential to decision whether appellant's removal of the children from Tennessee bars petition for custody, or should it be remanded for decision on the merits? We conclude that it should be remanded for decision on the merits. The girl is now nearly 15 years of age; she has been in this state nearly two years. California has a substantial interest in deciding what is best for her welfare. This state has ample means, probably better because of the duration of residence than those of Tennessee, for ascertaining what is conducive to the welfare of the girl.

We are not apprehensive that our ruling will establish a precedent that where there have been successive abductions the last in time should prevail until still another shall have occurred, thus encouraging repeated removals. Each of these complicated custody cases has its own features. It is not likely that events similar to those of this one will be of frequent occurrence. Besides, if the decision of the court is to keep the child with the mother, it is improbable, because of the girl's age, that another abduction would happen.

3. *Hearing on the merits*

Preliminarily, we observe that although the court made a finding that it is not true that it is in the best interest of Melissa to remain in the custody of appellant, we deem this finding to relate to the full faith and credit and "clean hands" elements of the court's decision, and not to be a conclusion as to what is best for the welfare of the child. The court evidently abstained from making such a decision. Respondent does not contend that a decision on the merits was made.

The decision on the merits will be determined as of the time of the new hearing. (*Munson* v. *Munson*, 27 Cal.2d 659 [166 P.2d 268].) At the first hearing there was admitted in evidence, over objection of appellant, the verified petition of Harry H. Hutcherson, in which statements discreditable to appellant appear. The petition is hearsay and inadmissible. The findings of fact and conclusions of law of the Tennessee court are admissible. (*Foster* v. *Foster*, 8 Cal.2d 719, 732 [68 P.2d 719].) But particularly because the Tennessee court gave its decree on stipulation and made no finding as to the truth or falsity of any of the allegations of Hutcherson's petition, the latter is not admissible, as respondent contends, as the public writing of a state (Code Civ. Proc., § 1901) or as the judicial record of a sister state (Code Civ. Proc., § 1905).

Judgment reversed.

Draper, P. J., and Salsman, J., concurred.