[Civ. No. 32354. Second Dist., Div. One. Aug. 27, 1968.]

Guardianships of the Persons and Estates of THERISA BA-RASSI et al., Minors. JOHN DENNIS McQUAID, Petitioner and Respondent, v. MARTIN BARASSI, Objector and Appellant.

Newell John Gardner for Objector and Appellant.

Jones, Jones, Sturges & Murphy and Arthur T. Jones for Petitioner and Respondent.

FOURT, J.—Martin Barassi, the natural father of three minor children, Therisa, Sharon and Martin, Jr., appeals from a judgment of the superior court declaring these children free from the custody and control of their natural father and granting the petition of their great-uncle to be appointed guardian of their persons and estates.

Appellant contends that the decision is contrary to the law because there is no showing or determination that the natural father is an unfit parent, and the evidence is insufficient to support the court's conclusion that he intentionally abandoned his children.

The record establishes that Caron Lynn Alphonso and Martin Barassi, the natural parents of the three minor children, were married in 1957 when Caron was sixteen years of age and Martin was nineteen. The marriage was stormy from the beginning and in 1960 Caron instituted divorce proceedings. Martin was present when the court, at the order to show cause hearing, announced its pendente lite order which gave custody of the three minor children to the mother, subject to the father's right of reasonable visitation, restrained the father from living in the family residence, from harassing and annoying the mother, and from threatening her parents, and further ordered the father to pay for the children's support.

The interlocutory and final decrees subsequently entered incorporated without modification the custody and support provisions of the pendente lite order.

At the time of her initial separation from Martin in September 1960, Caron returned to the home of her parents. Martin was concededly unwelcome there, and he was discouraged from making regular visits to his children by his wife's parents who once refused to allow him to see the children and several times told him when he arrived that the children were visiting relatives out of town. In fact, Caron obtained a welfare allowance soon after her separation from Martin and she then moved with the children to a housing project in Pacoima. Several weeks later, shortly after the interlocutory hearing, she was arrested for child neglect and the children were hospitalized for malnutrition and related ailments pending investigation by juvenile authorities. When Martin learned of these events he appeared in the juvenile court proceedings without counsel and requested custody. The probation officer,

however, concluded that neither parent was fit to have custody at that time and arranged for foster home care for the children.

About fourteen months later the children were released from foster care to return to the residence of their maternal grandparents. After Caron's remarriage in 1964, the children resided briefly with their mother and new stepfather, but they once again returned to their grandparents' home when their mother became seriously ill in September 1965. In January 1966, after the deaths of their mother and their maternal grandfather, the children were given by their grandmother into the custody of her brother, John McQuaid, where they have continued to reside to the present date.

On September 7, 1966, John McQuaid filed a guardianship petition which was initiated because the youngest child, Martin, Jr., required the consent of his legal guardian to a tonsillectomy. The petitioner on that date was appointed special guardian of the children pending hearing on the issue of permanent guardianship. Martin Barassi, who was remarried and living in Los Angeles, did not learn of his former wife's death until he received a copy of the guardianship petition on September 15, 1966.

Martin on October 10, 1966, filed written objections to the guardianship petition and on November 21, 1966, sought to obtain temporary custody or specific visitation privileges, alleging that the McQuaids refused to allow him to visit or see his children. On December 2, 1966, John McQuaid filed a petition to have the children declared free from the custody and control of their natural parent (Civ. Code, §§ 232-238) alleging that he had had custody of the children from February 1966 to the date of the petition; that proceedings were pending on his guardianship petition filed September 7, 1966; that the natural father had failed to communicate with his minor children or to provide for their support and maintenance since the date of the interlocutory decree of divorce, and that he had continued so to do following the death of the natural mother; that such failure was willful and with intent to abandon said children; and that John McQuaid had petitioned for guardianship because he was interested in the welfare of the children. John McQuaid also filed a declaration in opposition to Martin Barassi's motion for custody in which he further alleged that the children had not seen their father since 1960 and that they do not know their father; that the children were subject to extreme emotional disturbances during their early years because of friction between their mother and their

father, and they are now recovering from these problems; that it was the opinion of a psychiatrist consulted by John McQuaid that it would be inadvisable for the natural father to visit the children pending the guardianship hearing; that a court investigator had been appointed to determine the fitness of John McQuaid and of Martin Barassi to have custody of the children and the results of that investigation should be available to the court by January 3, 1967; and, in conclusion, that the granting of Martin Barassi's motion for visitation at this time would be opposed to the best interests of the minor children and would cause them great emotional disturbance.

On December 2, 1966, counsel stipulated that Martin Barassi should be allowed to see and visit his children pending the hearing on the guardianship petition, which was scheduled for January 3, 1967. On that date all matters relating to custody and control of the children were consolidated for hearing. At the conclusion of the hearing, the court entered findings of fact determining in pertinent part that the minor children, Therisa, Sharon, and Martin Barassi, Jr., at all times since February 1966, had been under the care, custody and control of John McQuaid; that the natural mother of the minor children died November 20, 1965; that their natural father and objector to the guardianship petition had failed to communicate with or to provide for the support and maintenance of said children from 1960 until the date the petition was filed and further had failed to communicate with or to provide for the support and maintenance of said children after the date of their mother's death; that such conduct was without excuse or justification and was with intent to abandon said children; that the best interests and welfare of the children would be served by declaring them free of the custody and control of their natural father and by having John McQuaid appointed guardian of the persons and estates of the children. The court's order, filed March 28, 1967, accordingly declared the three minor children free from the custody and control of their natural father and appointed John McQuaid guardian of their persons and estates. Martin Barassi's motion for a new trial was denied and he has appealed from the judgment.

At the hearing John McQuaid and his wife testified that they have two teen-age daughters; that they welcomed the Barassi children into their family after the death of their mother because their grandmother was then unable to care for them; that the Barassi children were happy and well cared

for in their home and called the McQuaid's "mom and dad"; and that their natural father had neither contacted nor supported the children. The maternal grandmother testified that during the entire time the children were in her home their father neither supported nor visited them. It was further disclosed, however, that friction had always existed between the children's father and their maternal grandparents; that no mention of their father had ever been made to the children by any of their maternal relatives with the result that the children did not learn of their father's existence until he was first allowed to visit them in December 1966; and that the children's maternal relatives made no effort to notify the natural father of his former wife's death prior to the filing of the guardianship petition. The probation officer's report was received into evidence. Upon questioning in court the person who prepared the report admitted that appellant had told her that he had omitted visiting the children for the reason that he could not pay for their support and that therefore he would be prohibited from seeing them; that she (the probation officer) did not interview any of the neighbors, friends or the employer of Mr. Barassi. The report gives no information with reference to the financial status of the McQuaid family. Admittedly the children are now and have been supported by public welfare assistance. It is noted that even now the father is having extreme trouble in getting to visit his children for apparently the McQuaids find it difficult to give up their weekend plans to allow the father to visit the children.

It was undisputed at the hearing that Martin Barassi is presently a fit parent and that he has a comfortable, adequate home to offer his children. He testified that he had always acknowledged these children to his present wife and discussed with her his desire to provide for them ultimately. When he learned of his former wife's death, he immediately consulted both his present wife and his pastor and all agreed in their sincere concern with the children's best interests that he should attempt to obtain custody. He candidly examined and explained his past conduct with respect to his family. At the time of his former wife's arrest for child neglect the probation officer told him that his occupation as a bartender exposed him to companions and influences which created an atmosphere that was not wholesome for the children and hence found him unfit to have their custody. Martin at that time also was given to understand that he must pay $30 per week toward the children's support or forego visitation privi-

leges. In an effort to rehabilitate himself, Martin thereafter quit his job as bartender, but he had difficulty obtaining other suitable employment because he never finished high school. Between the time of the interlocutory decree of divorce and the date upon which he learned of his former wife's death, he was unable to make support payments for his minor children. At first his employment was sporadic and he subsisted much of the time on $24 per week unemployment compensation; after his remarriage he achieved stable employment but experienced high medical expenses. He understood that his children had been returned to the custody of their maternal grandmother, but he did not attempt to visit them there for two reasons: first, he believed that his failure to make support payments deprived him of visitation privileges, and second, his relations with his wife's family were so strained that he was once ordered off the premises at gunpoint, and he wished to avoid the antagonism of estrangement in the best interests of all concerned.

Following his remarriage in 1962, Martin succeeded in obtaining steady employment and for the two years preceding this action he has worked for a messenger service with the reasonable anticipation that he may one day become part owner of the business which he has helped to build. He enjoys an excellent reputation with his friends and neighbors, is a good father to the three children of his present marriage, and maintains a clean and happy home with his present wife. Therisa, Sharon and Martin, Jr., have visited his home and they get along well with the three young children of their father's second marriage. The natural father claims that he has never lost interest in the three children of his former marriage and has attempted to achieve financial security to care for all of his children. He has a three-bedroom home, medical insurance coverage, and the desire to have all of his children in his home where his wife, who remains at home with her family, would welcome them. He has prepared a realistic budget and believes that he can provide for his children without the state welfare assistance which the McQuaids are receiving for their support.

 In the absence of supporting evidence or a finding by the lower court that the natural father is an unfit parent, the presumption is that he is a fit parent. (*Guardianship of Rose*, 171 Cal.App.2d 677, 679 [340 P.2d 1045]; *Stewart* v. *Stewart*, 41 Cal.2d 447 [260 P.2d 44].) It is well established in this state that in either guardianship proceedings or custody

288

proceedings in a divorce action, the parents of a legitimate child have preference over a nonparent, unless the parent is affirmatively found to be unfit. (*Guardianship of Smith,* 42 Cal.2d 91, 92-93 [265 P.2d 888, 37 A.L.R.2d 867]; *Stewart* v. *Stewart, supra,* at p. 452; *Shea* v. *Shea,* 100 Cal.App.2d 60, 65 [223 P.2d 32]; *Moffitt* v. *Moffitt,* 242 Cal.App.2d 580, 582 [51 Cal.Rptr. 683]; *Marlow* v. *Wene,* 240 Cal.App.2d 670, 676 [49 Cal.Rptr. 881].) Even in the case of an intervening divorce, upon the death of one natural parent the custody of the legitimate children of the marriage is automatically reposed in the surviving natural parent. (Civ. Code, § 197.) " ' " "The right of a parent to the care and custody of a child cannot be taken away merely because the court may believe that some third person can give the child better care and greater protection. One of the natural rights incident to parenthood, a right supported by law and sound public policy, is the right to the care and custody of a minor child, and this right can only be forfeited by a parent upon proof that the parent is unfit to have such care and custody." ' " (*Shea* v. *Shea,* 100 Cal. App.2d 60, 66 [223 P.2d 32].)

 The single limitation upon the foregoing legal principles occurs when the natural parent has forfeited his right to custody by abandoning his children. The sole issue in this case is, therefore, whether Martin Barassi, otherwise presently a fit parent and the person presumed by law to be entitled to the custody and control of his children, has conducted himself in a manner which compels this court to the conclusion that he has wilfully and with intent to relieve himself permanently of all parental obligations abandoned these children and thus lost the right to their custody.

The imprimatur of the law is clear, as provided in section 1409 of the Probate Code, that: "A parent who knowingly or wilfully abandons or, having the ability so to do, fails to maintain his minor child under fourteen years of age, forfeits all right to the guardianship of such child; . . ." A court must, however, proceed with caution in drawing inferences of abandonment from the circumstances and evidence, which must clearly and convincingly demonstrate the natural parent's intention before a conclusion of abandonment may be drawn. "To abandon means to give up a right absolutely with no intention of reclaiming it, and it must be shown by the clear, unequivocal and decisive act of the party." (*Guardianship of Kerns,* 74 Cal.App.2d 862, 868 [169 P.2d 975].) " 'In order to constitute abandonment "there must be an actual desertion, accompanied with an intention to entirely sever, so

far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.'' ' [Citations.] '' (*Guardianship of Rose, supra,* 171 Cal.App.2d 677, 679.)

We do not believe that the evidence in the instant case establishes a reasonable and conclusive inference of abandonment. The custody of the children, who were of tender years at the time of their parents' separation, was awarded to the mother, and a substantial role in their support and upbringing was undertaken, apparently voluntarily, by their maternal grandparents. These grandparents were concededly displeased with appellant. He reasonably believed that they entertained feelings of hostility toward him, and they discouraged his visits to his children. Surely, regardless of the legal consequences of his disability, the fact that the father was unable to contribute to the support of his children for several years while they resided with their maternal grandparents would, if anything, render these relatives less receptive to his contacts. Under the circumstances of this case, where the friction between the natural father and his wife's relatives arose and was emphasized by the rancor and discord of an immaturely conceived and stormy marriage, his failure to contact his children, though admittedly deliberate, cannot be construed to incorporate the intent to forever abandon them. ''The mere fact of separation for several years while the parent permits the child to be raised by others does not in itself establish abandonment. [Citations.] Intent is the decisive factor, and it may be shown by the facts and circumstances.'' (*Guardianship of Newell,* 187 Cal.App.2d 425, 429 [10 Cal.Rptr. 29].)

Nor should appellant's failure to contribute to the support of his children, under the circumstances, conclude his parental rights by a decree of abandonment. It was uncontroverted that Martin Barassi was unemployed for a substantial period of time, and that he sought to rehabilitate himself through a change of employment and remarriage, with attendant obligations and responsibilities. When he learned of his former wife's death, he took prompt and vigorous action to establish his rights to custody of his children. ''Although failure to support the child does not in itself constitute abandonment [citation], it is a factor which bears on abandonment. [Citation.]'' (*Guardianship of Newell, supra,* at p. 429.) ''The failure to support a child, which is due to poverty or other misfortune not resulting from the wilful acts or omissions of the parent, does not deprive the parent of the right of custody or control or the right to serve as guardian. This is for the

reason that there is in such circumstances no breach of legal or moral duty. . . . To fail to meet the burden of support means to cast off that burden, to refuse to bear it, and to make it necessary that others should assume it." (*Guardianship of Kerns*, 74 Cal.App.2d 862, 868 [169 P.2d 975].)

"We are of the opinion that even though the evidence affirmatively shows, without contradiction, that appellant did not contribute any substantial sum to the support of . . . [his] child, nevertheless . . . [he] did not, for that reason alone, forfeit . . . [his] right to its custody, because the evidence also shows that, owing to . . . poor health, frequent operations, and necessity of self support, . . . [he] at no time until . . . [recently] had the ability to maintain the child. To constitute a forfeiture of a parent's right to the custody of his child, failure to maintain it must be coupled with ability to do so." (*In re Green*, 192 Cal. 714, 719-720 [221 P. 903].)

It is true that the children have been removed from place to place with greater frequency than might generally be regarded as optimal for their development. We do not, however, accede to the philosophy that the place where a child happens to be found at the time when the issue involving his proper home arises is necessarily the best place for him, even though he appears to have made a happy adjustment there. This rule partakes of the old adage that so frequently guides laymen in practical action, that possession is nine tenths of the law. Truly the best interests of the children, in relation to each member of the natural family of the children, must balance any proper consideration of such matters.

The natural father, who is a fit person to have custody of the children who were not wilfully and intentionally abandoned by him, enjoys the superior right to their custody.

The judgment is reversed with instructions to deliver custody to the natural father.

Wood, P. J., and Lillie, J., concurred.