[Civ. No. 31697. First Dist., Div. One. May 2, 1974.]

Guardianship of OTTO LESTER PANKEY, a Minor, et al.
THELMA WALSTON et al., Petitioners and Respondents, v.
RUTH PANKEY, Objector and Appellant.

920

**COUNSEL**

Barry Wood for Petitioners and Respondents.

Thomas S. Brigham for Objector and Appellant.

## OPINION

**SIMS, J.**—Appellant, the paternal grandmother of the four minor children who are the subject of consolidated guardianship proceedings, has appealed from orders which overruled her objections and appointed a separate guardian for each of the minors. She has also appealed from a post-judgment order which denied her motion for an order waiving costs of a clerk's transcript on appeal and compelling the county to pay the cost of a reporter's transcript. At the threshold of her appeal on the merits she is faced with the respondents' motion to dismiss her appeal on the grounds that she was not a party to the action and that the appeal is frivolous and without merit.

On a review of the record it is determined that the grandmother has status to maintain the appeal on the merits and the motion to dismiss is denied. It is also concluded that the orders appointing the guardian should be affirmed, and that the appeal from the order denying appellant a free record should be dismissed.

### I

On November 9, 1971, respondent Thelma Walston, the maternal aunt of Otto Lester Pankey, a minor, filed a petition in the trial court seeking the appointment of herself as guardian of the person of the minor. Her declaration in support of a temporary custody and restraining order, which was issued the same day, recites that Otto Lester Pankey and his brothers and sister, Phillip Dale, Burnie Lee, and Judy Louise Pankey, whose ages run from one to five, are in the custody of named foster parents within the county; that they were placed there by their father, who in the past has not properly cared for his children; that petitions have been filed for appointment of guardians of the persons for the other three minors;[1] that the father is currently residing in an automobile, has been reported as out of the state, and unless restrained might attempt to flee the jurisdiction with the children, to their detriment and injury.

The petition with respect to Otto Lester Pankey alleges that the mother of the minor is deceased, and that the father resides at a designated address within the state. Listed as relatives of the minor residing in the state

---

[1] The notice of appeal refers to proceedings with respect to all four children. The clerk's transcript consists only of the moving papers with respect to Otto Lester Pankey. On motion of the objector and appellant all four matters were consolidated into the foregoing proceeding, and by stipulation the moving papers with respect to the other three children were omitted from the record to avoid a duplication of documents.

are the maternal grandparents, the paternal grandparents, and two other maternal aunts. Hearing on the petition was set for November 19, 1971, and the court ordered the notice by mail be given to the father and other relatives, including the objector and appellant. (See Prob. Code, § 1441.)[2]

On November 19, 1971, the paternal grandmother secured an order permitting her, as "objector," "to prosecute the within action without the prepayment of filing fees, court costs and other required costs and fees . . . ." She thereupon filed "Objection to Petitions for Appointment of Guardian," entitled jointly in all four proceedings, and a memorandum of points and authorities in support of her objections. A hearing was held that day. At the conclusion of the hearing the court overruled the objections and appointed the petitioners as guardians by minute order and formal order entered that date, and letters of guardianship were issued to the petitioners. The objector served and filed requests for findings of fact and conclusions of law on November 23 and 29, 1971. (See *Guardianship of Daniels* (1960) 177 Cal.App.2d 376, 377 [2 Cal.Rptr. 243].) Proposed findings of fact and conclusions of law were served and filed December 14, 1971, but not signed until January 4, 1972, and a judgment after trial by court, prepared by objector's attorney and served February 22, 1972, was signed and filed March 6, 1972. It was only after notice of entry of this judgment that the objector sought and secured the order consolidating the proceedings. On April 3, 1972 the objector filed her notice of appeal.

Section 1630 of the Probate Code provides in pertinent part, "An appeal may be taken from an order granting . . . letters of guardianship . . . ." (See *Guardianship of Leach* (1946) 29 Cal.2d 535, 539 [176 P.2d 369]; *Guardianship of Lyle* (1946) 77 Cal.App.2d 159, 160 [174 P.2d 910]; and *Guardianship of Brazeal* (1953) 117 Cal.App.2d 59, 60 [254 P.2d 886].) Section 1606 states in part: "When not otherwise specially prescribed in this division, practice and procedure . . . under this division shall be governed by the provisions of Division III of this code [§§ 300-1242, Administration of Estates of Decedents], so far as they are applicable." Section 1233 in turn provides, "Except as otherwise provided by this code or by rules adopted by the Judicial Council, the provisions of Part 2 (commencing with Section 307) . . . are applicable to

---

[2]Probate Code section 1441 provides: "Before making the appointment, such notice as the court or a judge thereof deems reasonable must be given to the person having the care of the minor and to such relatives of the minor residing in the state as the court or judge deems proper. In all cases notice must be given to the parents of the minor or proof made to the court that their addresses are unknown, or that, for other reason, such notice cannot be given. Notice shall not be given to the parents or other relatives of a minor who has been relinquished to a licensed adoption agency or who has been declared free from the custody and control of his parents."

and constitute the rules of practice in the proceedings mentioned in this code with regard to . . . appeals . . . ." (See *Guardianship of Lyle* (1946) 77 Cal.App.2d 153, 156 [174 P.2d 906].) This leads to Code of Civil Procedure section 902 (based on former § 938) which reads, "Any party aggrieved may appeal in the cases prescribed in this title. A party appealing is known as an appellant, and an adverse party as a respondent." (See *Guardianship of Copsey* (1936) 7 Cal.2d 199, 202 [60 P.2d 121]; *Estate of Colton* (1912) 164 Cal. 1, 4-5 [127 P. 643]; *Adams* v. *Woods* (1857) 8 Cal. 306, 314-315; *Slaughter* v. *Edwards* (1970) 11 Cal.App. 3d 285, 290-292 [90 Cal.Rptr. 144]; *Butterfield* v. *Tietz* (1966) 247 Cal. App.2d 483, 484-485 [55 Cal.Rptr. 577]; *Estate of Armstrong* (1966) 241 Cal.App.2d 1, 5-7 [50 Cal.Rptr. 339]; *Estate of Sloan* (1963) 222 Cal.App.2d 283, 291-292 [35 Cal.Rptr. 167]; *Estate of Lagersen* (1962) 210 Cal.App.2d 788, 791-792 [26 Cal.Rptr. 783]; *Estate of Thomas* (1946) 74 Cal.App.2d 389, 390 [168 P.2d 773]; *Pacific States Sav. & L. Co.* v. *Mortimer* (1945) 70 Cal.App.2d 811, 814 [161 P.2d 684]; and *Greif* v. *Dullea* (1944) 66 Cal.App.2d 986, 992-993 [153 P.2d 581].)

Respondents point out that one who is not a party to the record cannot appeal. (See *Eggert* v. *Pac. States S. & L. Co.* (1942) 20 Cal.2d 199, 200-201 [124 P.2d 815]; *Estate of Armstrong, supra,* 241 Cal.App.2d 1, 5-7 [50 Cal.Rptr. 339]; and *Estate of Thomas, supra,* 74 Cal.App.2d 389, 390. Cf. *Guardianship of Copsey, supra,* 7 Cal.2d 199, 203; *Butterfield* v. *Tietz, supra,* 247 Cal.App.2d 483, 485; and *Estate of Sloan, supra,* 222 Cal.App.2d 283, 292.) Nonappearing heirs, legatees and creditors are not parties to a probate proceeding. (*Estate of Kent* (1936) 6 Cal.2d 154, 160-162 [57 P.2d 901]; and *Estate of Thomas, supra,* 74 Cal.App.2d 389, 390.) Consequently the mere fact that the objector was named as a relative in the guardianship petitions did not make her a party to the proceedings. Nevertheless in *Estate of Sloan, supra,* the court noted, "An analysis of the cases cited by the respondents [including *Eggert* v. *Pac. States S. & L. Co., supra*] indicates that the 'parties of record' requirement was usually applied to exclude parties who were not properly 'aggrieved' and whose interest with the particular litigation was not clearly established or far more remote than the easily ascertainable interest of a remainderman. It would be anomalous to hold that a party bound by res adjudicata as the respondents argue is not entitled to appeal from a decree so binding him." (222 Cal.App.2d at p. 292. See also *Butterfield* v. *Tietz, supra,* 247 Cal.App.2d at p. 485; and *Estate of Armstrong, supra,* 241 Cal.App.2d at p. 6). ■ It is unnecessary to determine whether the appellant-objector fits within the above test. In this case she was not only named in the petitions but she also appeared as a party and filed objections, and her objections were overruled. It would appear that the objector is both a party of record and a person aggrieved.

In *Estate of Colton, supra,* the court observed, "The test laid down in *Adams* v. *Woods,* 8 Cal. 306, 'Would the party have had the thing if the erroneous judgment had not been given? If the answer be yea, then the person is the party aggrieved,' however satisfactory to the case then under consideration, by no means affords a complete definition of the phrase 'party aggrieved,' nor has it ever in this state been held to afford such a complete definition. Under our decisions any person having an interest recognized by law in the subject matter of the judgment, which interest is injuriously affected by the judgment, is a party aggrieved and entitled to be heard upon appeal." (164 Cal. at pp. 4-5.)

Respondents point out that the paternal grandmother did not seek custody for herself in her objections. It appears that both below and by her appeal she merely seeks to protect the custodial rights of her son, the father of the minor children. She testified that she had cared for the children after the death of their mother April 18, 1971, and until August when the father secured a housekeeper, whom he married; that when the father became dissatisfied with the treatment the children were receiving he asked the grandmother to take them back but she was unable to do so because of a broken arm; and that the children were placed with a neighbor across the street where they remained until the latter part of October when, with the father's consent, they were placed in the foster homes where they were living at the time the petitions were filed and heard. She never offered to take them herself, nor did she seek letters of guardianship. From the foregoing respondents conclude that under *Adams* v. *Woods, supra,* as quoted in *Estate of Colton, supra,* the objector has no standing as a person aggrieved because she would not have had the children if the erroneous judgment had not been given. (See 8 Cal. at p. 315, and 164 Cal. at p. 4.)

That contention is rejected as too narrow an interpretation of the provisions of section 902 of the Code of Civil Procedure. It has been held that the administrator of veterans' affairs who administers funds which flow into a ward's estate has such an interest in the accounting of the ward's guardian as will entitle him to appeal from an order settling the guardian's account and allowing fees for extraordinary services. (*Guardianship of Copsey, supra,* 7 Cal.2d 199, 202-203.) Similarly the Department of Mental Hygiene has been recognized as having standing on appeal to attack an award to an "heir hunter," not only because it might become a creditor of the incompetent ward who was in its custody, but also because of a duty to see that the ward's estate was protected and preserved from improper claims. (*Estate of O'Donnell* (1948) 85 Cal.App.2d 1, 13 [192 P.2d 94].)

Section 1461 since 1943 has provided in part, ". . . Any relative or friend of the alleged insane or incompetent person may appear and oppose the petition. . . ." (See *Guardianship of Lyle, supra,* 77 Cal.App.2d 153, 156-157.) There is no similar language in the provisions (§§ 1440-1443) for appointment of guardians for minors. Nevertheless the fact that the Legislature has directed the court to exercise its discretion to give notice to relatives of the minor residing in the state (§ 1441, fn. 2 above), indicates that those relatives may have some interest in the matter. As noted below, the issue of whether it is "necessary or convenient" (§ 1440) to appoint a guardian of the person of a minor who has a parent living is complex. In the last analysis the crucial criterion is the best interests of the child. The courts should not be niggardly in recognizing those who in good faith seek to assist the court in its decision. The cases last referred to above indicate that third persons may have a legitimate interest in proceedings involving incompetents, and similar considerations govern proceedings involving minors. Once the right to appear is established, the right to appeal an adverse decision should follow. "The right of appeal should be recognized unless the statute provides otherwise, and it should not be denied upon technical grounds if the appellant is acting in good faith. [Citations.]" *Greif* v. *Dullea, supra,* 66 Cal.App.2d at p. 993.)

Respondents also assert that the appeal is frivolous, because the objector is not seeking the children, but merely attempting, improperly, to assert matters which the father, who allegedly has defaulted, failed to assert. The test of frivolity is "whether any reasonable person would agree that the point is totally and competely devoid of merit, and, therefore, frivolous." (*Estate of Walters* (1950) 99 Cal.App.2d 552, 558 [222 P.2d 100].) The attempt to assert matters which might more properly be asserted by the defaulting father might be frivolous with respect to the protection of his rights. Nevertheless, the correlative right is that of the children to have the comfort and support of their natural father. It is not frivolous to review the record in their best interests. "We are also mindful of the principle that, when the propriety of an appeal is not free from dubiety, the better practice is to deny the motion to dismiss and permit the appeal to be determined on the merits. [Citation.]" (*Bailey* v. *Fosca Oil Co., Ltd.* (1962) 211 Cal.App.2d 307, 309 [27 Cal.Rptr. 454].)

The motion to dismiss must be denied.

## II

Since November 10, 1969, section 632 of the Code of Civil Procedure has provided in pertinent part: "1. In superior courts and municipal courts,

upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required, except as herein provided. [¶] In superior courts, upon such trial, the court shall announce its intended decision. Within the time after such announcement permitted by rules of the Judicial Council, any party appearing at the trial may request findings. Unless findings are requested, the court shall not be required to make written findings and conclusions. . . . [¶] Where findings are required, they shall fairly disclose the court's determination of all issues of fact in the case. [¶] The procedure for requesting, preparing, and filing written findings and conclusions and the written judgment of the court shall be in accordance with rules adopted by the Judicial Council." Rule 232, California Rules of Court, after providing the manner in which findings may be requested, stated and states in subdivision (e): "Findings shall fairly disclose the court's determination of all issues of fact material to the judgment in the case and shall be concisely and chronologically stated whenever practicable. Findings shall not refer merely to the truth or falsity of allegations contained in the pleadings." These provisions are applicable to probate proceedings. (*Guardianship of Daniels, supra,* 177 Cal.App.2d 376, 377.) Nevertheless, the court in adopting findings of fact and conclusions of law, which were proposed by the petitioners below, merely recited, "The allegations contained in Paragraphs I, II, III, IV, V, VI, VII, VIII, and IX are true." There is no dispute about the allegations contained in paragraphs I, II, III and IV of the petition. In fact, paragraphs II, III and IV were admitted by the objector. They respectively refer to the status of the petitioner, to the age of the child, to the residence of the child within the county, and to the names of the persons having custody of the child. Paragraph V referred to the parents of the child and the objector questioned the residence given for the father. (See part III below.) Paragraph VI set forth the relatives of the minor residing in the state, and although it was denied, no issue is made with respect to its factual accuracy. Paragraph VII refers to the absence of other proceedings relating to the custody of the minor, and paragraph VIII states that there has been no guardian appointed for the person or estate of the minor, and that there is no known estate of the minor and therefore there is no necessity for a guardian of the estate or a bond. No issue is raised as to those facts despite the objector's denial.

The reference in the findings to the truth of the allegations contained in paragraph IX purports to establish the following facts: "It is necessary and convenient that a guardian be appointed for the person of said minor because of the following facts: The mother of said minor died on April 18, 1971 in a traffic accident. Since that time, said minor and his siblings

have been in the care and custody of the natural father Edward Leeroy Pankey who has not been able to provide for their emotional or physical well-being in that he has lost his employment, he has remarried and a divorce is now pending with the most recent wife, Greta Pankey; the natural father has been off and on residing in an automobile, and said minor child has not been properly clothed, fed, or provided with the emotional necessaries designed to promote his well-being. The natural father of the child is currently being sought by the Ukiah Judicial District Justice Court on two separate criminal warrants. The natural father of the child has placed the child in a foster home where he is being cared for by strangers, unknown to him. Petitioner, as the maternal aunt, and a relative, can provide a decent home and the love and affection the child needs for normal development." It is assumed that similar facts were found with respect to each of the children. (See fn. 1 above.)

From the foregoing facts the trial court concluded, "That it is necessary and convenient that a guardian be appointed for the minor and that Petitioner is a fit and proper person to serve as said guardian."

Prior to January 1, 1970, the rules governing the appointment of a guardian other than a parent were established as follows: "Section 1407 of the Probate Code provides that as between persons equally entitled in other respects to the guardianship of a minor preference is to be given first to a parent. This section has been construed to be substantially the same as former section 246(3) of the Civil Code and section 1751 of the Code of Civil Procedure which provided, in substance, that a parent if competent is entitled to custody in preference to any other person. . . . The code sections contemplate that the care of a minor child be awarded to a parent, if a fit and proper person, as against a stranger. [Citations.]" (*Stewart* v. *Stewart* (1953) 41 Cal.2d 447, 452 [260 P.2d 44]. See also *Guardianship of Smith* (1954) 42 Cal.2d 91, 92-93 [265 P.2d 888, 37 A.L.R.2d 867]; *Roche* v. *Roche* (1944) 25 Cal.2d 141, 143 [152 P.2d 999]; *In re Green* (1923) 192 Cal. 714, 721 [221 P. 903]; *Estate of Moore* (1918) 179 Cal. 302, 304 [176 P. 461]; *Matter of Forrester* (1912) 162 Cal. 493, 494-495 [123 P. 283]; *Guardianship of Snowball* (1909) 156 Cal. 240, 244 [104 P. 444]; *In re Campbell* (1900) 130 Cal. 380, 383 [62 P. 613]; *Guardianship of Barassi* (1968) 265 Cal.App.2d 282, 287-288 [71 Cal.Rptr. 249]; *Guardianship of Clark* (1963) 217 Cal.App.2d 808, 810-811 [32 Cal.Rptr. 111]; *Guardianship of Joaquin* (1959) 168 Cal.App.2d 99, 101 [335 P.2d 507]; *Guardianship of Wisdom* (1956) 146 Cal.App.2d 635, 639 [304 P.2d 221]; *Guardianship of Marshall* (1954) 124 Cal.App.2d 807, 810 [269 P.2d 160]; *Shea* v. *Shea* (1950)

100 Cal.App.2d 60, 64-67 [223 P.2d 32]; and *Guardianship of Case* (1943) 57 Cal.App.2d 844, 848 [135 P.2d 681].)

The objecting grandmother asserts that no one other than her son, the surviving father, can be appointed guardian without a finding that the father was unfit or incompetent to have the custody of his children, or that he had knowingly and wilfully abandoned the children, or that he, having the ability so to do, had failed to support them. (See *Estate of Moore, supra,* 179 Cal. 302, 304.) She claims that not only did the court fail to so find (see *Stewart* v. *Stewart, supra,* 41 Cal.2d 447, 453; *Matter of Forrester, supra,* 162 Cal. 493, 495; and *Guardianship of Clark* (1963) 217 Cal.App.2d 808, 811 [32 Cal.Rptr. 111]), but also that the evidence fails to support any such finding.

In support of the findings and judgment, the petitioners point to testimony of the maternal aunt who stated that she had observed bruises on the children. Over objection, she further testified that in answer to her inquiries the children stated, "Daddy had spanked them." She was also permitted to testify over objection that she had been informed, without stating the name of her informant, that the father and the stepmother had each used a curtain rod in disciplining the children. The witness also testified that although she had never seen the stepmother hit the children with a curtain rod, she had seen her strike them with lots of other things. There was further testimony of other shortcomings in the care of the children during the period the father lived with the woman he engaged to take care of the children in August, and married around September 1. In September, when dissatisfied with her care, and unable to house their children with their grandmother, he placed them with a neighbor across the street from where he was living in Calpella. When the welfare department complained that the neighbor's home was inadequate and unlicensed, around the 1st of October he placed them in the foster homes where they were residing when the petitions were filed.

It appeared that while the children were running around, neglected by their stepmother, they turned on a stove in a neighbor's house and blackened it all up, and started a fire in a yard behind a house. As a result the landlord requested that the family leave their residence in Calpella. Another witness testified that in the last part of August he went to a party at a neighboring apartment of some relative of the father, and that the father and stepmother attended and let the children sleep in the car all night until the party broke up at 7 a.m.

The record shows that the father worked sporadically in the lumber mills and in automobile repairing. According to the petitioning maternal

aunt he was unemployed when she last saw him, and said he had been laid off because he did not belong to the union. His mother testified that he worked off and on during his marriage and that he was working in April when his wife was killed; that he was laid off two or three weeks later because his wages were attached; that later he worked in the pear sheds until laid off for the same reason. Subsequently he worked for Plywood Fabricators with his father. He was laid off there for two months, resumed work again for four weeks, and terminated with a general lay off in October.

In support of the allegation that the father was currently being sought on two separate criminal warrants the attorney for the petitioner asked the court to take judicial notice of the contents of one justice court file. The objector's attorney's statement that the charge in the file was a traffic offense is uncontradicted. No other record has been made to show the nature of the proceedings, or to support the allegations of the petition.[3]

The petition set forth that on November 9 the father was residing at Hogan's Court No. 4, North 101 Highway, Calpella, California, and notice of hearing was mailed to him there. According to the allegations found to be true, as quoted above, he "has been off and on residing in an automobile." The aunt's declaration of the same date recites that the father "is currently residing in an automobile" and that he "has been reported in New Mexico and Arizona during the last week . . . ." The grandmother testified that her son left the area the day before Halloween; that the following Tuesday (November 2, 1971) he telephoned from Arkansas and told her he was on his way to Michigan for a job. She had not been in touch with him since he received the notice of the hearing.

The petitioners also called an individual who apparently represented the stepmother in proceedings pending in the Ukiah Justice Court. He testified that on the Friday evening proceeding the hearing (November 12, 1971) he observed in pigeonhole No. 16, by the registration counter in the Broiler Motel,[4] a registration card which bore the same date in numbers

---

[3]Objector points out that the petitioners failed to comply with the provisions of Evidence Code section 453 which provides with respect to judicial records (§ 452, subd. (d)), that a party must not only request the hearing court to take judicial notice of the records of the other court, but also must give "each adverse party sufficient notice of the requests, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; . . ." (§ 453, subd. (a)), and furnish "the court with sufficient information to enable it to take judicial notice of the matter." (*Id.*, subd. (b).) (See *Smith* v. *Hatch* (1969) 271 Cal.App.2d 39, 49 [76 Cal.Rptr. 350]; and Evid. Code, § 459.)

[4]According to appellant, the Broiler Motel or Broiler Lodge Motel is located in Redwood Valley, and is not the same hostelry as Hogan's Court in Calpella.

as the cards he had just completed for his relatives who had just checked in. This card bore the names "Ed and Greta Pankey." He did not see either individual at the motel. The grandmother testified that her son and his second wife had in fact moved to the Broiler Lodge Motel, when they left Calpella, and that she had gone there to get his things before he went to Michigan.

A cousin of the deceased wife, who was petitioning for appointment as guardian of the person of Phillip Dale Pankey, testified that he had not seen the father in the past year and one-half, but that approximately two or three months before the hearing (between August 19 and September 19) the father telephoned him twice, collect, and told him that the way things were going he could not provide for his children. The witness testified, "And I tried to talk to Ed and explain to him this would be the best thing should be done; and he agreed on this here."

It may be assumed that if the father had appeared and personally contested the petitions for guardianship, and had sought to retain the legal custody of his children, the foregoing evidence would be of questionable sufficiency to show unfitness, abandonment or failure to support.

■ It is well established that the failure of a parent to support his child is not grounds for depriving him of custody in the absence of evidence that he had the ability so to do. (See *In re Green, supra,* 192 Cal. 714, 719-720; *Guardianship of Barassi, supra,* 265 Cal.App.2d 282, 289-290.) Nor does the fact that the parent has left the children with others reflect an abandonment, where such placement has been made without any intent to sever the parental relationship and in an effort to secure a more stable environment for the children. (See *In re Green, supra,* 192 Cal. 714, 720; *Matter of Forrester, supra,* 162 Cal. 493, 496-497; *Guardianship of Snowball, supra,* 156 Cal. 240, 243-244; *Guardianship of Joaquin, supra,* 168 Cal.App.2d 99, 101; and *Guardianship of Marshall, supra,* 124 Cal.App.2d 807, 810.) The record here shows that following the death of their mother, the father cared for the children in his mother's home until he attempted to set up his own with a caretaker whom he married, and that when he discovered her shortcomings he made other arrangements which were not shown to be detrimental to the four children as a family unit.

■ On the general question of unfitness this court is bound by the following rules: "It is now settled that the custody of a child may not be given to a third person in the absence of a finding that the parent seeking such custody is unfit. [Citations.] ■ It is equally well settled that an appellate court is required to consider only the evidence most strongly favoring the respondent and may not reverse a judgment unless there is

no substantial evidence which, with the inferences reasonably to be drawn therefrom, will support the judgment. ■ A decision as to whether the evidence supports a finding must necessarily rest upon the evidence in the particular case, and this is especially true with respect to a finding of fitness or unfitness in such a case as this. The meaning of the words 'fit' or 'unfit' has never been clearly defined in this state, either by statute or decision. ■ It appears from many decisions, however, that many things including such matters as the parent's character, his disposition, his emotional stability, his neglect or indifference toward the child, his trustworthiness, and his acts and conduct, may have a bearing on his present fitness for such purpose, and may be considered by the trial judge in deciding the question of the child's custody. ■ Of necessity, in making such a finding the trial court must be allowed and must exercise a rather wide discretion in weighing the evidence and drawing reasonable inferences therefrom, and in determining what part of the testimony is to be believed. The appearance and manner of the parties and witnesses while testifying may well have an important bearing on a just result, and it is peculiarly true in this type of case that the trial judge is in a much better position to weigh the effect of the evidence than is an appellate court." (146 Cal.App.2d at p. 639.)

The other evidence in this case has no substantial weight in determining the fitness of the father as of the time of the hearing. *In re Green supra,* notes, ". . . it must be remembered that a parent, if competent, does not lose his right over his child merely because his conduct may at one time have fallen short of what may be described as 'ideal.' " (192 Cal. at p. 721.) The hearsay evidence of a beating with a curtain rod during the hegemony of the stepmother, subsequently discarded by the father, the mischief caused by the children who were left unattended by the stepmother while the father was at work, and the all-night party with the children in the automobile, appear on the whole record to be isolated instances which were ameliorated by the father's placing the children in other homes. The existence of a traffic warrant, even if proved (see fn. 3 above), fails to show either that the father was unfit or that he had fled the jurisdiction, abandoning his children, in fear of prosecution, rather than to obtain work elsewhere.

■ Nevertheless, there are elements in this case which render the appearing grandmother powerless to raise the foregoing objections on behalf of her son. He has not appeared and asserted his right to custody. (Whether he was properly notified is discussed below, part III.) The fact remains that the court was confronted with an absent sole parent, not a contest between a parent and a stranger. There was no one present with

a right to the legal custody of the children, so the court, even though all of the allegations of the petition were not established, properly concluded that it was necessary and convenient to appoint a guardian for each of the minors. It is questionable whether the admissions and oral consent to guardianship made two or three months before could rise to the level of a legal consent to the granting of the petitions actually filed, because in the meantime the children had been placed, albeit with government assistance, in foster homes satisfactory to the father. Nevertheless, the court, on the father's failure to appear, could draw some inference that custody with relatives would not be objected to on his part.

Finally, it should be pointed out that a finding of parental unfitness is no longer required by the law. Civil Code section 4600, operative January 1, 1970, expressly applies to "any proceeding where there is at issue the custody of a minor child." It states in pertinent part, "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."

It may be difficult to distinguish between facts which render a parent unfit, and facts which render that parent's custody detrimental to the child. Nevertheless, the Legislature has expressly recognized that the best interests of the child is a factor to be considered, and that there may be instances when the best interests of the child indicate that custody should be placed in other than a parent even though that parent is not unfit as measured by former standards. In *Guardianship of Marino* (1973) 30 Cal. App.3d 952 [106 Cal.Rptr. 655] [hg. by the S.Ct. den.], the court upheld the appointment of a maternal aunt and her husband as guardian of their eight-year-old nephew, who had lived with them since the death of his mother when he was two weeks old, over the objections of the father who had only taken an interest in his son in the preceding two years or so. The father, contended, as does the grandmother in this case, "that since there was no finding of abandonment or unfitness on his part, the order awarding custody to respondents is in violation of Probate Code section 1407 and the judicial interpretation of that section contained in *Guardianship of Smith*, 42 Cal.2d 91 . . . ." (30 Cal.App.3d at p. 957.) The court after reviewing the history of the adoption of section 4600 (*id.*, pp. 957-959) upheld the guardian's contention "that the enactment of Civil Code section 4600 operated to eliminate the finding of parental unfitness required theretofore by *Smith* to overcome the natural parent's preferential right to custody in all guardianship cases." (*Id.*, p. 957.)

The record in this case, however, contains no express finding that the award of custody to the father would be detrimental to the children and that the awards of custody to the respective four petitioning relatives is required to serve the best interests of the child. The weakness of the evidence relating to nonsupport, abandonment, and unfitness tends to becloud the propriety of making a finding that the custody of the father would be detrimental to the children. Again, however, the fact that the court's choice is not between an appearing parent and a collateral relative, but between no one with legal custody and the petitioners affects the criteria. The quoted provisions are not applicable under the circumstances. Section 4600 also provided, and now provides: "Custody should be awarded in the following order of preference: (a) To either parent according to the best interests of the child [other criteria deleted Stats. 1972, ch. 1007, § 1, p. 1855]. (b) To the person or persons in whose home the child has been living in a wholesome and stable environment. (c) To any other person or persons deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child." In the absence of the father's request for custody the criteria in "(c)" control and the court did find that each petitioner was a fit and proper person to serve as guardian after making inquiry concerning the home he or she proposed to make for the minor.

It is concluded that the findings are sufficient, and that although the evidence fails to support all of the facts found, it was sufficient, in the absence of an appearance by the father, to show that the appointment of a guardian was necessary and convenient.

### III

In the foregoing discussion it has been assumed that proper notice of the hearing on the petitions was given to the father. As has been set forth above the allegations, declarations and testimony raise considerable conflict as to the whereabouts of the father at the time the proceedings were commenced. At the time of the hearing the court entered an order finding "that notice of the time and place of said hearing has been given pursuant to Order Prescribing Notice and as required by law, . . ." The formal findings recite, "All notices as required by law have been given and all interested parties have knowledge of the action." The objector has suggested that a question of jurisdition may exist, but has not raised it directly. She merely points out that the father's failure to contest the petition cannot be considered a consent because it was not shown that he had actual notice of the proceedings. Nevertheless if the failure to give actual notice to the father was jurisdictional, the orders should not stand.

Prior to 1921 the law as embodied in section 1747 of the Code of Civil Procedure provided, ". . . Before making such appointment, the court must cause such notice as such court deems reasonable to be given to any person having the care of such minor, and to such relatives of the minor residing in the county as the court may deem proper." (Stats. 1903, ch. 183, § 1, p. 205.) Under that statute the Supreme Court upheld the appointment of a guardian for a minor as against the contention it was void because no notice was given to her mother who resided without the county where the minor resided in the custody of the petitioner for guardianship. The court concluded, "We have found no case in which it was held that an appointment of a guardian of the person of a minor, made in accordance with all statutory requirements, was void for want of actual notice to a parent and open to collateral attack." (*In re Lundberg* (1904) 143 Cal. 402, 411 [77 P. 156]. See also *In re Morehouse* (1917) 176 Cal. 634, 636 [169 P. 365]; and *Estate of Eikerenkotter* (1899) 126 Cal. 54, 55 [58 P. 370].)

In 1921 (Stats. 1921, ch. 139, § 1, p. 138) the Legislature added the language now found in the second sentence of section 1441 of the Probate Code (see fn. 2 above), reading: "In all cases notice must be given to the parents of the minor or proof made to the court that their addresses are unknown, or that, for other reason, such notice can not be given." The court in *In re Dahnke* (1923) 64 Cal.App. 555 [222 P. 381] upheld an order vacating the appointment of guardian when the record failed to show that notice had been given to the mother of the minor child. The court said: "By the express terms of the statute it is made mandatory that notice be given to the nonpetitioning parent, or that, if such notice be not given, proof be made either that such parent's address was unknown or that there was some valid reason why the notice could not or should not be given. . . . It follows that notice to [the mother], or statutory proof showing why it was not given, was absolutely necessary to give the court jurisdiction of the proceeding and power to make the order appointing appellant guardian." (64 Cal.App. at pp. 559-560. See also *Guardianship of Kerns* (1946) 74 Cal.App.2d 862, 869 [169 P.2d 975]; *Guardianship of Rapp* (1942) 54 Cal.App.2d 461, 462 [129 P.2d 130]; *In re Arkle* (1928) 93 Cal.App. 404, 407-408 [269 P. 689]; and *In re Pryor* (1924) 68 Cal. App. 312, 316 [229 P. 60].)

In this case if the notice to the father can be considered defective on the record it is because the record shows that his address was unknown and that proper notice could not be given. Under these circumstances the orders should not be set aside at the instance of a third person. (See *Guardianship of Rapp, supra,* 54 Cal.App.2d 461, 465.) In *In re Lund-*

*berg, supra,* the court pointed out, "The right of the state to provide for the disposition of the custody of children whose safety and welfare are menaced by the conduct or incompetency of their natural guardians has been too long established to be seriously questioned. It is of course clear that, where it is practicable, some notice of such proceedings should be given to the parent, but it is also clear that in many cases the situation may be such that it is not possible to give personal notice to the parent. The child may be a homeless waif, whose parentage is unknown in the community in which it is, or the parents may have abandoned the child, and their whereabouts be unknown. Doubtless, other instances might be cited. The safety and welfare of such a child might absolutely require the appointment of some legal custodian, and yet if actual notice to the parent were a prerequisite in such cases no appointment could be legally made." (143 Cal. at p. 408.) Although the statute has been amended as noted above, the policy involved supports proceeding when the parent cannot be located.

The father is not without his remedy. "If it subsequently develops that a parent has, by such proceedings, been fraudulently deprived of the custody of his minor child, the order of appointment may be annulled or vacated by appropriate proceedings, and the court having jurisdiction of the guardianship proceedings will always, upon seasonable application by a parent who did not in fact have notice, liberally exercise the discretionary power confided to it, to give the parent full opportunity to be heard upon the question as to the necessity for the appointment of another as guardian. And, finally, the guardian so appointed may be removed whenever it is no longer proper that the ward should be under guardianship." (143 Cal. at p. 409. See also, *Guardianship of Van Loan* (1904) 142 Cal. 423, 426 [76 P. 37]; *Guardianship of Kerns, supra,* 74 Cal.App.2d 862, 869; *In re Arkle, supra,* 93 Cal.App. 404, 407-408; *In re Pryor* (1924) 68 Cal.App. 312, 317 [229 P. 60]; and *In re Dahnke, supra,* 64 Cal.App. 555, 560-562.)

The provisions formerly found in Civil Code section 253, subdivision 8, are those now contained in subdivision (7) of section 1580 of the Probate Code, which reads: "A guardian however appointed may be removed by the court, after notice and hearing, substantially as provided in Section 1755 of this code, for any of the following causes: . . . (7) When it is no longer necessary that the ward should be under guardianship; . . ." Subdivision (8) further provides: "In any other case in which the court shall in its discretion deem such removal to be in the best interests of the ward provided, in considering the best interests of the ward, if the guardian was appointed by will or deed, the court shall take that fact into con-

sideration." In *Guardianship of Case, supra,* 57 Cal.App.2d 844, the court terminated a guardianship and restored the child to its father. The court stated, "In the conduct of guardianship proceedings it is proper for the court always to consider changed conditions to the end that it may make such orders with respect to a guardianship as will prove to be for the welfare of the minor. A material change in the mode of life, habits or behavior of petitioner in the period elapsing between the hearings of two successive petitions may justify the court in making new and different orders with reference to the guardianship. (*Guardianship of Snowball,* 156 Cal. 240, 242 . . . .) Upon a petition for the removal of a guardian the court is not bound by any judgment rendered at a previous hearing except as to the facts which have remained unchanged since the former hearing." (57 Cal.App.2d at p. 847.)

Because the father is the proper party to assert any defects in the proceedings with respect to notice to him, because he has a remedy if he elects to appear and contest or seek the termination of the existing guardianships; and because the objecting grandmother has failed to show that the appointments were not necessary or convenient or not in the best interests of the minors, or that any of the petitioners would not be suitable and able to provide adequate and proper care and guidance for the child (see Prob. Code, § 1440; and Civ. Code, § 4600), her appeal on the merits must fail and the orders appointing the guardians must be affirmed.

## IV

The objecting grandmother, upon filing a declaration of indigency, was permitted to file her objections to the petitions without prepayment of filing fees or court costs. On April 3, 1972, she filed her notice of appeal and designation of the record. Estimates were given of $100 for reporter's fees and $151.20 for a clerk's transcript of all four proceedings. On April 24, 1972, she filed a notice of motion and motion for order waiving costs of clerk's transcript on appeal and compelling county to pay cost of reporter's transcript. This motion was supported by the declaration of her attorney, which recited that following a request to the clerk for a waiver of the clerk's fees and the payment of reporter's fees, the district attorney had advised the clerk that she could not waive or charge the county for the fees and costs of the record on appeal. On May 1, 1972, by order filed the following day, the court denied the motion. On May 4, 1972, the objector filed a notice of appeal from that order. In the principal case a stipulation was filed reducing the clerk's transcript by avoiding duplication of similar papers in all four proceedings. Thereafter, the record was otherwise secured for objector in connection with both appeals.

On June 21, 1972, the district attorney entered an appearance in this court on behalf of the county and the county clerk by waiving service of the notice of appeal, notice of the designation of the record, and notice of preparation of clerk's transcript. He stipulated that the record submitted by the objector in connection with her purported appeal from the order was correct and complete. On June 29, 1972, this court granted the objector's petitions to proceed in forma pauperia, and the records for both appeals were filed without the payment of any filing fees. (See *Ferguson* v. *Keays* (1971) 4 Cal.3d 649, 654 [94 Cal.Rptr. 398, 484 P.2d 70].) Although the district attorney was thereafter served with a copy of objector's brief, he did not reply thereto on behalf of the county and the county clerk.

Nevertheless the appeal from the order of May 1, 1972, which denied the objecting grandmother a free record on appeal, must be dismissed. The order is not an appealable order. (*Agnew* v. *Contractors Safety Assn.* (1963) 216 Cal.App.2d 154, 156 [30 Cal.Rptr. 690] [hg. by S.Ct. den.; cert. den. (1964) 375 U.S. 976 (11 L.Ed.2d 421, 84 S.Ct. 496)]. See also *Guardianship of Leach, supra,* 29 Cal.2d 535, 539; *Guardianship of Brazeal, supra,* 117 Cal.App.2d 59, 60; and *Guardianship of Lyle, supra,* 77 Cal.App.2d 159, 160-161. Cf. *Earls* v. *Superior Court* (1971) 6 Cal.3d 109, 112-113 [98 Cal.Rptr. 302, 490 P.2d 814] [mandamus].)

*Boddie* v. *Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780], upon which the objector relies, goes no further than to conclude that "due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." (401 U.S. at p. 374, and see pp. 380-383 [28 L.Ed.2d at pp. 116-117, 120-122].) It may be assumed that the question of whether the custody of a minor should be with his father or with a stranger is "the adjustment of a fundamental human relationship" within the concept of *Boddie.* (See *In re Joseph T.* (1972) 25 Cal.App.3d 120, 130 [101 Cal.Rptr. 606].) In this case, however, the objector has had access to the courts. *Boddie* does not deal with the right of appeal and to a record on appeal in a civil matter. (Cf. *Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055].) Moreover, here the application is not by either the father or by the minors whose relationship is at stake. Finally, it appears that a record has been furnished, and the objector has not been prejudiced. (See *In re Joseph T., supra,* 25 Cal.App.3d 120, 131.)

The motion to dismiss the appeal from the orders appointing guardians is denied, and said orders are affirmed. The appeal from the order denying

the objector's motion for order waiving costs of a clerk's transcript on appeal, and compelling county to pay cost of reporter's transcript is dismissed.

Molinari, P. J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 26, 1974.