161 Cal.App.3d 587 (1984)
207 Cal. Rptr. 728
In re CHERYL E., a Minor.
COUNTY OF VENTURA PUBLIC SOCIAL SERVICES AGENCY, Petitioner and Respondent,
v.
EDWIN E., Objector and Appellant. EVELINA E., Plaintiff and Respondent,
v.
COUNTY OF VENTURA PUBLIC SOCIAL SERVICES AGENCY et al., Defendants and Appellants.
Docket Nos. 68879, B003231.
Court of Appeals of California, Second District, Division Six.
November 2, 1984.
*593 COUNSEL
Mary K. Jones, under appointment by the Court of Appeal, for Objector and Appellant.
Dorothy L. Schechter, County Counsel, and Mary C. Ward, Assistant County Counsel, for Petitioner and Respondent and Defendants and Appellants.
Maxine R. Benmour and M. Carmen Ramirez for Plaintiff and Respondent.
Andrew M. Wolf as Amicus Curiae on behalf of Minor.
*594 OPINION
STONE, P.J.
The instant case involves two appeals consolidated on this court's motion. Edwin E. (EDWIN) appeals from a judgment terminating his rights to custody and control of his biological child, Cheryl E. (CHERYL). (Civ. Code, § 232.) County of Ventura (COUNTY), Public Social Services Agency (PSSA), and Adoption Worker (AW) appeal from a judgment that Evelina E.'s (EVELINA) relinquishment of CHERYL for adoption be rescinded for fraud and undue influence. We granted leave for CHERYL'S court-appointed trial counsel to file an amicus curiae brief in the appeal from the judgment of rescission. (2d Civ. B-003231.)
We affirm the judgment of rescission in case B-003231 and reverse the judgment terminating EDWIN'S parental rights in case 2d Civ. 68879.

FACTS

EVELINA
At the time of trial on EVELINA'S civil action for relinquishment based upon fraud, she was 41 years old, had been married 21 years, had 8 children (including CHERYL), had never worked outside the home, had a ninth grade education, and had been receiving aid to dependent children for 10 years.
In March 1981, approximately one month prior to CHERYL'S birth, EVELINA discovered that she and her family were facing eviction from their home in Simi Valley.
In April 1981, EVELINA discussed with PSSA the possibility of allowing her baby to be adopted. On April 15, 1981, she met with AW, explained that she and her six children were about to be evicted, that her husband had a girlfriend and that EVELINA did not know where her family would go or what they would do following eviction. When AW informed her that she would need to visit EVELINA'S home, EVELINA indicated that she should telephone before coming.
On April 21, 1981, without notice to or permission from EVELINA, AW sent a letter to the hospital indicating that EVELINA was considering relinquishing her baby to PSSA for adoption and that PSSA would take responsibility for the child upon its discharge from the hospital. In said letter, AW further indicated that PSSA's address should be used on the birth certificate and that PSSA had requested that the doctor circumcise the baby if a boy.
On April 22, 1981, AW went to EVELINA'S home without the requested prior notice and met five of her children. She noted that all the children had *595 blue eyes and fair hair and told EVELINA there would be no problem placing the baby.
On April 24, 1981, a marshal evicted EVELINA and her family. She knew since early morning that the birth of her child was imminent and sat on a mattress in the front yard from 3 p.m. until 8 p.m. when she was finally taken to the hospital where CHERYL was born early the next morning. She testified that her pregnancy had been the worst she had experienced, her blood pressure was elevated, and she was extremely anxious concerning her family's welfare.
That same day AW came to the hospital and informed EVELINA that she had to sign forms which would allow CHERYL to receive medical care and allow PSSA to remove her from the hospital. The document was an "under care" agreement for two weeks temporary placement until May 7 while EVELINA decided whether to relinquish her child for adoption, a deviation from the usual one month's interval. Although EDWIN was at the hospital, AW chose not to meet with him. EVELINA signed the "under care" agreement and pursuant thereto PSSA placed CHERYL in foster care.
Following her release from the hospital, EVELINA, still unwell from the difficult pregnancy and birth, lived with her mother under difficult and crowded circumstances. During this time AW wrote EVELINA requesting her to make an appointment with her. When EVELINA missed the first appointment, AW wrote again suggesting alternate dates including AW's day off. AW testified that if the "under care" agreement expired without the mother's signing a relinquishment, AW was supposed to turn the case over to PSSA for instigation of dependency proceedings.
On May 12, 1981, at AW's suggestion EVELINA and two daughters met with AW in AW's car in the PSSA parking lot at approximately 5 p.m. EVELINA and her daughters testified that AW informed EVELINA that without EDWIN's signature the relinquishment was invalid, that if she signed it PSSA would have more "clout" against her husband and that she would be able to have CHERYL returned to her within one year if she so desired, but if she did not sign, PSSA might have to give the baby to EDWIN and his girlfriend. EVELINA was very much against such a placement.
EVELINA testified that AW told her it was unnecessary to read the document since it contained everything they discussed and that AW seemed in a hurry to conclude the meeting. The daughters corroborated this testimony. The daughters, 16 and 18 years of age, signed as witnesses. AW also had EVELINA sign another "under care" agreement backdated to May 7, 1981, *596 so that the COUNTY would be reimbursed for funds expended upon CHERYL'S case between May 7 and May 12.
During the course of the meetings between AW and EVELINA, the only service AW offered EVELINA was "adoption counseling and taking the child under care" even though EVELINA had informed AW that her husband would not consent to adoption.
After the May 12 meeting with AW, EVELINA and her daughters left her mother's house and moved to Long Beach where they lived with EDWIN in a camper shell in a wrecking yard containing cars and car parts. AW wrote EVELINA two letters during this period informing her of CHERYL'S progress. EVELINA attempted to contact AW by telephone several times but could not reach her. In September 1981, the juvenile court granted PSSA's petition declaring CHERYL a dependent child. (Welf. & Inst. Code, § 300, subd. (a).) In October 1981, CHERYL was placed with the pre-adoptive foster parents, with whom CHERYL continues to reside.
In January 1982, AW advised EVELINA by letter that PSSA would soon file to terminate EDWIN'S rights if PSSA did not hear from him. AW had mailed two letters to EDWIN July 1, one certified, asking him to sign a relinquishment but had received no response.
On February 17, 1982, 10 months after CHERYL'S birth, EVELINA wrote to AW asking what her rights were regarding CHERYL and reiterated that EDWIN did not want to relinquish the baby. AW responded by letter that EVELINA had given up her rights to CHERYL, that CHERYL had been in foster care for over six months with no contact from EDWIN and that PSSA intended to file a petition alleging his abandonment of the child. AW's letter stated also that PSSA did not want to rescind EVELINA'S relinquishment as it felt adoption was in CHERYL'S best interests. EVELINA called AW to request rescission of her relinquishment, and was sent forms to fill out and did so.
On April 13, 1982, AW and her supervisor met with EVELINA who informed them of her improved living conditions and her desire to care for CHERYL. She also told them her husband never received the letters regarding CHERYL. AW and her supervisor informed EVELINA that CHERYL would not be returned to her because they concluded CHERYL had bonded to her foster pre-adoptive parents with whom she had lived five months. EVELINA filed the instant lawsuit November 24, 1982.
The trial court found that EVELINA had relinquished her child for adoption as a result of fraud and undue influence; that AW either specifically advised *597 her that she had one year in which to change her mind or "selected words which would have given a reasonable person of plaintiff's background the belief, understanding and knowledge that plaintiff had a year in which to change her mind"; that AW's misrepresentations were wilful and material and EVELINA changed her position in reliance thereon; that EVELINA relinquished her child for adoption as a result of undue influence; that she made one communication voluntarily on April 15, 1981, and the others were initiated by AW; that AW was in a dominant position, decided at the first meeting the baby should be adopted and took every step necessary and possible to accomplish the adoption; and that EVELINA was not given every opportunity to make her own decision without inducement from someone else.
The trial court granted EVELINA'S petition to rescind the relinquishment.

EDWIN
The evidence adduced at the trial on PSSA's petition to terminate his parental rights (a separate proceeding held prior to EVELINA'S action to rescind the relinquishment) indicated that EDWIN had not responded to any letters or notices sent to his address in Wilmington, near Long Beach. Two certified letters were returned unclaimed, and one marked "refused." He testified that he never received them. EVELINA testified she had destroyed the letters sent by regular mail and took the "pink slips" from the registered letters and concealed their existence from EDWIN. EDWIN testified that she told him she had signed a relinquishment and due to his prior experience in which his out-of-wedlock child was adopted, he thought he had no right to custody of CHERYL after his wife had signed the document. He said he was unable to discover CHERYL'S whereabouts through his wife and friends. He admitted he had other problems to concern him at the time of her birth and "too many kids already." He finally wrote to AW after EVELINA told him of AW's letter of February 1982, indicating pending termination proceedings.
The trial court found that the minor child had been relinquished by her mother and abandoned by her father, and accordingly granted the petition freeing the child from EDWIN'S parental custody.

DISCUSSION
PSSA contends, in their appeal, that: (1) there was insufficient evidence to support findings of fraud, undue influence and rescission; (2) the trial court should have considered the child's best interests and decided the custody issue; and (3) EVELINA'S delay in taking action constituted laches.
*598 CHERYL'S counsel argues that: (1) this court has insufficient record on which to base a decision because of pending juvenile proceedings; (2) the minor was an indispensable party to the action for rescission; and (3) the court erred in rejecting the defense of laches.
EDWIN asserts that: (1) the procedures followed by PSSA resulted in a denial of his due process rights and (2) there is insufficient evidence to support a finding of abandonment.

EVELINA

I

SUBSTANTIAL EVIDENCE OF FRAUD AND UNDUE INFLUENCE
PSSA challenges the sufficiency of the evidence and attacks the trial court's findings set forth in the Statement of Decision. (1) We recite our oft-repeated refrain: When a finding of fact is attacked on grounds that it is not supported by substantial evidence, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the findings. (Guardianship of Phillip B. (1983) 139 Cal. App.3d 407, 413 [188 Cal. Rptr. 781].) (2) The reviewing court looks to the evidence supporting the successful party and must disregard any contrary showing. (Id., at p. 414.) When two or more inferences can reasonably be deduced from the facts, we are without power to substitute our deductions for those of the trial court. The testimony of a single witness, even a party, is adequate to support the trial court's findings. (Coldwell Banker & Co. v. Pepper Tree Office Center Associates (1980) 106 Cal. App.3d 272, 277 [165 Cal. Rptr. 51].) All the evidence most favorable to respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, we must affirm the judgment. (Id., at p. 278.)
(3) PSSA, in its attacks on the trial court's findings, asks us to reweigh the evidence on appeal and draw inferences contrary to those of the trial court. This we can not do. The interpretation of testimony is the exclusive province of the trial judge. (Rees v. Department of Motor Vehicles (1970) 8 Cal. App.3d 746, 751 [87 Cal. Rptr. 456].) It is the function of the trial court to weigh all the evidence and to draw any reasonable inferences it finds warranted. (Hasson v. Ford Motor Co. (1977) 19 Cal.3d 530, 545 [564 P.2d 857, 99 A.L.R.3d 158].) The inferences the trial court drew were reasonable. It is, therefore, irrelevant that the evidence might also have supported PSSA's version. (Ibid.)
*599 (4) Furthermore, a trial court rendering a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them. (Division of Labor Law Enforcement v. Transpacific Transportation Co. (1977) 69 Cal. App.3d 268, 274 [137 Cal. Rptr. 855].) A failure to find on an immaterial issue is not error nor is a judge required to make a finding outside the pleadings. (Colombo Construction Co. v. Panama Union School Dist. (1982) 136 Cal. App.3d 868, 878 [186 Cal. Rptr. 463].) We find that the trial court's statement of decision disposed of all material issues raised at trial, and fairly discloses the court's determination of all issues of fact.
(5a), (6a) We have read the entire record carefully, and our review compels us to conclude that substantial evidence exists to support the trial court's finding of fraud and undue influence. Our inability to reweigh the evidence does not imply that we are insensitive to the situations of all parties, to wit: the very difficult and heart-rending position the pre-adoptive foster parents find themselves in, having bonded to CHERYL, now three and one-half years old; CHERYL who knows no other parents but the pre-adoptive foster parents who have nurtured her for three years; and the biological parents, EVELINA and EDWIN, who feel they have been wrongfully deprived of their child.
(5b) Nevertheless, AW's intent to induce EVELINA to alter her position can be inferred from the fact that she made representations with knowledge EVELINA would act in reliance upon them. (7) The representations need not be made with knowledge of actual falsity, but need only be a false assertion of fact by one who has no reasonable grounds for believing his own statements to be true, and when made with intent to induce the other to alter his position, to his injury. (Nathanson v. Murphy (1955) 132 Cal. App.2d 363, 368 [282 P.2d 174].) Such reckless disregard of the truth can be tantamount to wilful misrepresentation. (Yellow Creek Logging Corp. v. Dare (1963) 216 Cal. App.2d 50, 55 [30 Cal. Rptr. 629].)
(8) In addition, no actual intent to defraud on the part of the defendant need be shown, as fraud includes not only intentional misrepresentations but also negligent misrepresentations. (Balfour, Guthrie & Co. v. Hansen (1964) 227 Cal. App.2d 173, 192 [38 Cal. Rptr. 525].) Thus, "scienter" is not an element of every cause of action for deceit. (Hale v. George A. Hormel & Co. (1975) 48 Cal. App.3d 73, 84 [121 Cal. Rptr. 144].)
(5c) The trial court found, and its findings are supported by substantial evidence, that AW made an assertion of fact which led EVELINA to believe that she had one year in which to change her mind regarding the adoption. *600 It is clear that the trial court impliedly found against PSSA on the relevant issue of whether AW had made representations with reckless disregard of the truth. (Yellow Creek Logging Corp. v. Dare, supra, 216 Cal. App.2d 50, 58.)
(9) When findings are questioned, it is the duty of an appellate court to compare them with all the evidence in the case, to consider them as a whole, and to construe them liberally in support of the judgment. (De Vrahnos v. George (1962) 203 Cal. App.2d 210, 221 [21 Cal. Rptr. 481].) We have done so. (5d) PSSA contends that the findings are fatally defective because they do not reflect, nor did EVELINA explicitly state, that but for AW's misrepresentations EVELINA would not have signed the relinquishment.
(10) A contract cannot be rescinded when it appears that consent would have been given and the contract entered into notwithstanding the duress, menace, fraud, undue influence, or mistake relied upon. (Greenawalt v. Rogers (1907) 151 Cal. 630, 635 [91 P. 526].) (5e) Here, the court found that plaintiff justifiably relied upon the misrepresentations and thereupon changed her position. (Royal v. Lange (1911) 15 Cal. App. 724, 725 [115 P. 750].)
Implicit in the trial court's finding that EVELINA relinquished her child for adoption as a result of fraud is the inference that she would not have relinquished her child but for the fraud. Considering the evidence with the view of upholding the findings of the trial court, the aforestated inference is reasonable. (See Craig v. Shea (1919) 45 Cal. App. 351, 356 [188 P. 73]; De Vrahnos v. George, supra, 203 Cal. App.2d 210, 221.)
In stating its intended decision, the trial court opined: "I have an idea if [AW] after that meeting on the 15th had done nothing, the baby would have been taken care of. Welfare may have been involved. I really doubt an adoption proceeding would [have] ensued (sic) from there." These statements, contrary to PSSA's assertions that they are unsupported "feelings" or conclusions, are further indication that the trial court found from the conflicting evidence that AW had induced the relinquishment. EVELINA'S testimony that she was led to believe she had a year in which to decide whether to allow the adoption of CHERYL was corroborated by her daughters. AW's own report and testimony reveal that she went unannounced to EVELINA'S house after the initial April 15 meeting and wrote to EVELINA after her discharge from the hospital urging her to meet with AW to sign the necessary papers. As stated, supra, it is not our province to analyze evidentiary conflicts. (Balfour, Guthrie & Co. v. Hansen, supra, 227 Cal. App.2d 173, 198.)
*601 (6b) PSSA next contends that there is no evidentiary support that EVELINA relied on a confidential relationship with AW or that she was forced to relinquish her child against her own wishes. (11) Direct evidence of undue influence, however, is rarely obtainable. The court is often obliged to infer undue influence from the totality of the circumstances. (Keithley v. Civil Service Bd. (1970) 11 Cal. App.3d 443, 451 [89 Cal. Rptr. 809].) (12) Undue influence consists in the use of excessive pressure by a dominant person over a servient person resulting in the apparent will of the servient person being in fact the will of the dominant person. (Ibid.) Furthermore, undue susceptibility to such overpersuasion "may be the product of physical or emotional exhaustion or anguish which results in one's inability to act with unencumbered volition." (Id., at p. 451.) Elements which, when simultaneously present in significant number as in the instant case, characterize the persuasion as excessive are (1) discussion and consummation of the transaction in an unusual place; (2) insistent demand that the business be finished at once; (3) extreme emphasis on untoward consequences of delay; and (4) absence of third party advisors to the servient party. (Odorizzi v. Bloomfield School Dist. (1966) 246 Cal. App.2d 123 at p. 133 [54 Cal. Rptr. 533].)
(6c) In the instant case AW's own report indicated that EVELINA felt "overwhelmed at the thought of starting to raise another child, especially in view of the family's financial circumstances"; "EVELINA is under a great deal of pressure. The family is facing possible eviction and she will have to appear in court later in the week ...."; "I feel that EVELINA is really, really overwhelmed by her situation." EVELINA testified that she was in the worst physical and emotional condition of her life, was evicted the day before giving birth to CHERYL, and had a precarious living arrangement with her mother at the time she met with AW to sign the papers, all factors making her especially susceptible to undue influence.
PSSA complains that any mother considering giving up her child for adoption experiences similar stress. That, however, is exactly the reason adoption authorities and social workers must ascertain that the mother's decision to relinquish the child is not caused by economic or family considerations which, given a reasonable time, might be resolved, with or without temporary public resources.
We take judicial notice, as did the trial court, that in 1982 section 30615 of article 3, title 22 of the California Administrative Code was amended to mandate that parents initial the forms to verify that they understand the ramifications of signing the relinquishment, that they have decided that adoption is in the best interests of the child, and that they may obtain other services, including temporary child care, if uncertain about relinquishing *602 the child. We anticipate that the amendment to the relinquishment procedures will serve to deter such abridgment of these elemental human rights.
In addition, AW as a PSSA adoption worker was in a dominant position and a position of trust. EVELINA turned to her for advice and help. Having been on welfare for over 10 years, EVELINA was accustomed to responding to governmental employees as authority figures. As EVELINA's welfare worker testified about his relationship to welfare recipients, "in my position if I ask a person to do something, they're more or less bound to do it because it is pertinent to their well-being and their family's well-being.... If they don't do it they're discontinued for failure to provide information...."
Moreover, the unusual circumstances of signing the documents in a parked car, the rush to have them signed, and the explanation that EDWIN might be able to take the baby to Long Beach if she did not sign are elements of undue influence. Since the essence of undue influence is the apparent will of the servient person being in fact the will of the dominant party (see Keithley v. Civil Service Bd., supra, 11 Cal. App.3d 443), PSSA's argument that there should be evidence AW forced EVELINA to relinquish the child against her will is without merit.

II

LACHES
(13a) PSSA further contends that the remedy of rescission is not available where there has been a change of position and resulting detriment, as in this case, to CHERYL. (14) Although tender or return of consideration usually must be made prior to rescission, the rule is not inflexible. (Carruth v. Fritch (1950) 36 Cal.2d 426, 430 [224 P.2d 702, 24 A.L.R.2d 1403].) (13b) At the time PSSA refused to rescind the relinquishment, CHERYL was still not even one year old, and had been with the pre-adoptive parents only five months. The trial court heard expert testimony concerning CHERYL'S bonding to her foster parents on the issue of laches. The expert testified that most bonding occurs before three years of age but not before a baby is six months old. Additionally, because of proceedings involving EDWIN, it was obvious the child was not free for adoption. The trial court did not find EVELINA had delayed unduly in asserting her rights. Substantial evidence supports the trial court's decision that laches was not a bar to rescission.

III

BEST INTERESTS OF THE CHILD AND INDISPENSABLE PARTY
(15a) PSSA and the minor's counsel contend on appeal that the trial court in the rescission action should have considered CHERYL'S best interests *603 as a factor in determining whether the relinquishment should be set aside. (16a) Counsel also contend that the child was an indispensable party to the rescission action. We know of no legal authority which requires the court on its own motion to join the child as an indispensable party in the parent's action for rescission of a contract (the relinquishment herein) due to fraud. Nor did any party suggest such action in the trial court although independent counsel for the minor was present and participated in the trial.
In addition, CHERYL'S counsel filed a trial brief in which he suggested the court bifurcate the issue of rescission from that of the child's best interests. The trial court indicated that it did not believe the child's best interests were raised in the pleadings and therefore were not properly before the court except as they related to laches. Neither PSSA nor the minor's counsel attempted to disabuse the court of this notion but appeared to be in agreement. (17) A party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do, nor will a judgment be reversed because of the trial court's failure to give relief not embraced in the pleadings. (State Comp. Ins. Fund v. Maloney (1953) 121 Cal. App.2d 33, 42 [266 P.2d 81].) (16b) In any event, there was no prejudice as the minor was represented by independent counsel who participated in the trial.
(15b) We are mindful that Civil Code section 232.5 mandates that provisions of the chapter regarding freedom from parental custody and control shall be liberally construed to serve and protect the best interests and welfare of the child. The proceeding before the trial court, however, was not such a proceeding nor was it brought within any statutory provision of the aforementioned chapter. It was, as the trial court correctly ruled, an equitable action for rescission, reformation of contract and cancellation of written instrument. There was no error in the court's failure to make findings concerning CHERYL'S best interest since such issue was not before the court.
Nevertheless, we are not blind to the best interests of the child. There is still a dependency proceeding pending (Welf. & Inst. Code, § 300, subds. (a), (e)) in juvenile court in which the best interests of the child will be protected along with, and balanced against, the rights of the biological parents.[1] (In re Angelia P. (1981) 28 Cal.3d 908 [171 Cal. Rptr. 637, 623 P.2d *604 198]; In re La Shonda B. (1979) 95 Cal. App.3d 593, 599 [157 Cal. Rptr. 280]; Sorrentino v. Family & Children's Soc. of Elizabeth (I) (1976) 72 N.J. 127 [367 A.2d 1168]; (II) (1977) 74 N.J. 313 [378 A.2d 18].)
We presume that PSSA will propose a recommended plan for family reunification which will encompass successful completion of therapy programs by the parents, any necessary home improvements and a gradual introduction of CHERYL to her biological parents if other elements of the reunification plan are met. (Welf. & Inst. Code, § 358.1; Cal. Rules of Court, rule 1376(b) and Advisory Committee Comment thereto; see In re John B. (1984) 159 Cal. App.3d 268 [205 Cal. Rptr. 321].) It may be that EVELINA and EDWIN may discover that the trauma of wrenching CHERYL from the only parents she has known for almost four years will be too painful for all of them, especially CHERYL, and that they will voluntarily consent to CHERYL'S adoption by her pre-adoptive foster parents. (Cf. In re Baby Girl M. (1984) 37 Cal.3d 65, 76, fn. 12 [207 Cal. Rptr. 309, 688 P.2d 918].) If CHERYL'S biological parents are unwilling or unable to abide by the terms of the juvenile court's reunification plan, a future proceeding to free CHERYL for adoption should be contemplated. The pre-adoptive foster parents themselves may file such a petition.
Because of PSSA's past involvement which led to these actions, and the foster parents' close association with the probation department, the juvenile court is free to appoint an independent entity, a neighboring county's protective services agency, or professional person hitherto uninvolved with the parties to act as legal guardian of the child. Similarly, PSSA may wish to file a supplemental petition (Welf. & Inst. Code, § 777) to allege additional grounds to sustain the dependency proceedings under Welfare and Institutions Code sections 300, subdivision (a) or (b) depending upon present circumstances.

EDWIN
In the Civil Code section 232 proceedings against EDWIN, which was held before the trial of the rescission action, the trial court found that CHERYL had been relinquished by her biological mother and abandoned by her biological father and accordingly freed CHERYL from the custody and control of EDWIN. The court predicated its finding of abandonment upon EDWIN'S *605 lack of response to PSSA's letters, his failure to provide financial support for the child, and his lack of contact and communication with her.
The trial court disbelieved that EVELINA had destroyed the letters sent to her husband by PSSA because "the letters that were destroyed are in the file ... they are both in the file returned and unclaimed and those letters were not destroyed." EDWIN correctly points out that the court misunderstood EVELINA'S testimony. The record reflects that EVELINA testified she destroyed the letters which were delivered by regular mail and took the pink slips indicating there were registered letters at the post office.[2] This error alone would not cause reversal if there was other substantial evidence to support EDWIN'S lack of contact with the child.
(18) Failure of a parent to support his child is not grounds for depriving him of custody absent evidence that he had the ability to do so. (Guardianship of Pankey (1974) 38 Cal. App.3d 919, 932 [113 Cal. Rptr. 858].) There was no evidence that EDWIN had the ability to support the child except his March 1982 letter in which, at that time, he offered to support the child. Nor was there evidence that PSSA or the county ever asked him to support her.
(19) Although a parent's failure to contribute to his child's support absent demand does not necessarily show abandonment, such failure coupled with failure to communicate, may do so. (In re Conrich (1963) 221 Cal. App.2d 662, 667 [34 Cal. Rptr. 658].) EDWIN, by his own admission, had "too many problems" to affirmatively and aggressively seek the location of his child. (20) Were we reviewing only EDWIN'S appeal, without the records and evidence from case B-003231 to enlighten us, and if EVELINA were not in the picture, we would affirm the judgment terminating EDWIN'S parental rights to CHERYL since there is substantial evidence to support abandonment based upon his lack of communication, interest or attempted contact. (Civ. Code, § 232, subd. (a)(1).)
However, the trial court in the Civil Code section 232 proceedings was laboring under two fundamental misconceptions  first, that EVELINA'S relinquishment was voluntary, and second, that the termination proceedings against EDWIN would have been initiated in spite of EVELINA'S relinquishment. The fallacy of this argument is that but for EVELINA'S fraudulently induced relinquishment and PSSA's refusal to rescind it, CHERYL may not have been in foster care until June 16, 1982, the date county counsel filed the petition under section 232 against EDWIN. Thus, we are compelled to *606 reverse the judgment freeing CHERYL from EDWIN'S custody and control without prejudice to PSSA's right to file another petition to terminate EDWIN'S parental rights at a later date in light of the additional information and evidence available for the trial court.
(21) Parental due process rights do not spring full-blown from the biological connection between parent and child; they require relationships more enduring. (Lehr v. Robertson (1983) 463 U.S. 248, 261 [77 L.Ed.2d 614, 626, 103 S.Ct. 2985].) Nevertheless, the fundamental liberty interest of the natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state. (Santosky v. Kramer (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599, 606, 102 S.Ct. 1388].) Parental rights have not been abrogated to the extent that the child's best interests are the only consideration in severing legal bonds between parent and child. The right of an individual to raise his or her own child free from unwarranted state intrusion remains a fundamental right. (In re Carmaleta B. (1978) 21 Cal.3d 482, 489 [146 Cal. Rptr. 623, 579 P.2d 514]; Adoption of D.S.C. (1979) 93 Cal. App.3d 14, 23-24 [155 Cal. Rptr. 406].) (22) Although the juvenile court need not find parents unfit in order to give physical custody to nonparents under Civil Code section 4600, in determining whether the legal status between child and natural parents should be severed, the right of the parents is not always to be subordinated to the best interests of the child. (Adoption of D.S.C., supra, 93 Cal. App.3d 14, 23-24.) Because of the drastic nature of the act of terminating the parent-child relationship, all of the prescribed conditions precedent to terminating parental custody and control must be established. (In re Norma M. (1978) 77 Cal. App.3d 110, 115 [143 Cal. Rptr. 412]; see also Matter of Adoption of L. (1984) 61 N.Y.2d 420 [474 N.Y.S.2d 447, 462 N.E.2d 1165]; Sorrentino v. Family & Children's Soc. of Elizabeth, supra, 367 A.2d 1168.)

CONCLUSION
Our decision has not been easily nor lightly made. To hold in the rescission action that the best interests of the child override any and all considerations would give carte blanche to both governmental agencies and individuals in independent adoptions or custody battles to use any method available to obtain custody of a child and to delay proceedings knowing that the longer the child is kept in a placement, the less likely the court to remove it. Moreover, we cannot encourage, under the guise of "best interests" or "home stability," the arbitrary determination by a governmental agent that a well-educated "professional" couple will be better parents than "rednecked hillbillies" (AW's words, not ours) who are on welfare and have six *607 other children.[3] Although it has been a basic tenet of our laws that parents have broad freedom with regard to childbearing, this theoretical deference to family autonomy, continually stressed by social workers, politicians and judges, in practice is often ignored, "and widespread intervention, for extremely inappropriate reasons, takes place." (Wald, State Intervention on Behalf of "Neglected" Children; A Search for Realistic Standards, (1975) 27 Stan. L. Rev. 985, 989, fn. 22, herein referred to as Wald I.)
There are cases of obvious abuse and deprivation in which a public agency should step in to protect the child and where removal of the child is in its best interests. Those involved in the adoption process, however, including judges, social workers and therapists, have an obligation to guard against the influence of class and life style biases. (23) (See fn. 4.) (See Wald I, supra, at p. 999.)[4] When EVELINA attempted to rescind the relinquishment PSSA arbitrarily decided that cultural and socioeconomic factors governed the "best interests" of the child, without seriously investigating and considering the parenting skills and abilities of EVELINA and EDWIN. AW recommended against rescission of the relinquishment without examining either EVELINA'S current family residence and circumstances or that of the foster parents; the record reflects that the "hearing" AW and her supervisor gave EVELINA was merely cosmetic, as at that meeting they told her that they were recommending against reunification. It is here appropriate to note that AW neglected to question EVELINA'S fitness as a parent; further, she even described EVELINA as a capable loving mother and indicated that the other children were upset at not having the baby.
Whereas 1984 is upon us chronologically, we shall strive to stave off its Orwellian ramifications. Too near in our history another government attempted to impose its arbitrary decision on parental selection.
*608 The judgment in B-003231 is affirmed. The judgment is 68879 is reversed. The matter is remanded to the juvenile court for further proceedings consistent herewith.
Abbe, J., and Gilbert, J., concurred.
NOTES
[1] Michael Wald in his seminal article entitled State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights (1976) 28 Stan.L.Rev. 623, (herein referred to as Wald II) emphasizes that the juvenile court should not punish dependent children for transgressions committed by society upon their parents. "The current system often operates in an unjust and discriminatory fashion. However, that does not necessarily lead to the conclusion that we ought not to remove children or terminate parental rights unless the service system is adequately funded. The problem must be considered from the child's perspective as well. Are we prepared to say that an endangered child should not be removed because the state has not provided services that might have kept the family intact, when such services do not exist? Are we going to deny a child in foster care a permanent home because the state has not helped her parents regain custody, thereby consigning the child to impermanent foster care?" (Id., at p. 692, fn. 269.)
[2] AW testified in the trial in case B-003231 that EVELINA told her in April 1982, that EDWIN had never received the letters.
[3] AW, in her report, stated that EVELINA "fits the stereotype of a red-neck hillbilly living in the Appalachia's or the Ozarks. She clings ferociously to her pride in being white and thus being above Blacks and Mexicans while in reality she has had a marginal standard of living."
[4] Justice Brennan in his concurring opinion in Smith v. Organization of Foster Families (1977) 431 U.S. 816, 834-835 [53 L.Ed.2d 14, 29, 97 S.Ct. 2094], noted that, "[s]tudies also suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family rather than return the child to his natural family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child. Rein, Nutt & Weiss 42-44; Levine, Caveat Parents: A Demystification of the Child Protection System, 35 U. Pitt L. Rev 1, 29 (1973). This accounts, it has been said, for the hostility of agencies to the efforts of natural parents to obtain the return of their children." (Fn. omitted.)

"The fact that a home is `improper' in the eyes of the state officials does not necessarily mean that a child in that home is subject to physical or emotional harm." (Roe v. Conn (M.D. Ala. 1976) 417 F. Supp. 769, 779; see also In re Raya (1967) 255 Cal. App.2d 260, 265 [63 Cal. Rptr. 252].)