Filed 8/7/24  In re V.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re V.R., a Person Coming Under the Juvenile Court Law. | |
| MERCED COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. LUIS C., Defendant and Appellant. | F087313 (Super. Ct. No. 21JP-00091-A) **OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Forrest W. Hansen, County Counsel, and Ann Hanson, Deputy County Counsel; Gordon-Creed, Kelley, Holl, Angel and Sugerman, Jeremy Sugerman and Anne H. Nguyen for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Detjen, J. and De Santos, J.

In this juvenile dependency case, Luis C. (father), appeals from the juvenile court's orders made at a Welfare and Institutions Code[1] section 366.26 hearing, summarily denying his section 388 petition for the return of his minor daughter, V.R., to his custody and subsequently terminating his parental rights. He contends the court erred by (1) determining father had not sufficiently met his burden to justify an evidentiary hearing on his petition and (2) declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).

Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2021, the Merced County Human Services Agency (agency) received a referral from law enforcement regarding then three-week-old V.R. There had been a domestic disturbance between father and mother, Maria R.,[2] in V.R.'s presence, and the home was also observed to be unsafe and unkempt. Law enforcement placed V.R. in protective custody. Mother reported to the investigating social worker that father had been abusive toward her and used drugs, including cocaine and marijuana. Father denied any domestic violence when he spoke to the social worker but admitted he used cocaine on the weekends. It was later determined that father also regularly used methamphetamine.

Further investigation revealed a previous child welfare referral for mother's four older children, V.R.'s half siblings, from September 2020. It was reported by the reporting party, as well as the children, that father regularly hit two of mother's children, ages six and one, with a belt, and mother did not adequately protect the children from

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal, and to our knowledge, has not appealed separately. We omit facts pertaining to her that are not relevant to the issues presented in this appeal.

father. A dependency case was initiated, mother was unable to reunify, and the children's fathers were ultimately granted sole physical and legal custody of their respective children.

On July 8, 2021, the agency filed a petition on behalf of V.R. alleging she came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) due to domestic violence between the parents, an unclean home, and father's drug use.

At the detention hearing conducted on July 12, 2021, the juvenile court ordered V.R. detained from the parents. At the jurisdictional hearing conducted on August 19, 2021, the court found the allegations set forth in the petition true and that V.R. was described by section 300, subdivision (b).

Father began visiting V.R. consistently, and for the most part, was observed to be appropriate with her. At a visit in September 2021, however, it was suspected father may have been under the influence of substances; he was reluctant to return V.R. and disregarded instructions to leave the premises. Visitation center staff called law enforcement because father appeared to be waiting outside in his vehicle to follow the care providers home.

At the dispositional hearing conducted on September 23, 2021, the juvenile court ordered V.R. removed from the parents and that the parents were to receive family reunification services. Father's case plan consisted of a domestic violence program, parenting classes, random drug testing, a drug and alcohol assessment, and weekly supervised visits with V.R.

In November 2021, father began attending a 16-week domestic violence/batterers treatment program. He reported attending a drug and alcohol assessment in December 2021 but was referred out-of-county due to his residence. In December 2021, father began attending parenting classes. He continued to visit V.R. and was observed to "demonstrat[e] appropriate parenting skills" and be caring and loving with her. V.R. was

observed as being comfortable with father. At one point during the review period, however, father grew upset at the possibility of sharing custody with mother in the future, and he told the social worker he would stop everything with regard to the case and canceled a visit he had with V.R. that was set for the next day.

At the six-month status review hearing conducted on February 3, 2022, the juvenile court continued reunification services for the parents.

The agency's 12-month status review report dated July 26, 2022, recommended reunification services be terminated for both parents. Father continued to attend parenting classes and visit V.R. He completed 16 weeks of anger management. He was deemed not in compliance with random drug testing, however, as he had missed several tests. He completed a substance abuse assessment in Merced County in April 2022, but when the social worker contacted the counselor, the counselor reported that father insisted he did not need services because he did not have a problem and would not be attending.

In an addendum report dated September 19, 2022, the agency changed its recommendation to continue services for father only. Father's subsequent drug testing indicated he had been free from substances since mid-April 2022. It was again reported he consistently visited V.R., and his visits were appropriate and positive.

At the 12-month status review hearing conducted on September 28, 2022, the juvenile court, finding father's progress had been substantial and that mother had not been offered reasonable services as to mental health, continued services for both parents.

In October 2022, father had two unsupervised visits with V.R. at his home, and they were reported to go well. Father continued to attend parenting classes and weekly visits, and the visits were positive. As for drug testing, however, the agency discovered several issues, including father refusing to drug test on several occasions, tampering with urine samples, and gluing hair on his head for hair follicle tests. It was also suspected

4.

father was previously having other people drug test for him. Based on the drug testing issues, father's visits were reverted to supervised visits in November 2022. The agency's 18-month status review report dated December 8, 2022, recommended the court terminate reunification services for both parents and set a section 366.26 hearing.

At the 18-month status review hearing conducted on January 17, 2023, the juvenile court followed the agency's recommendation, terminating services for both parents and setting a section 366.26 hearing. The court reduced father's visits to once per month.

The agency's section 366.26 report dated July 12, 2023, recommended the court terminate parental rights and order a plan of adoption for V.R. V.R. had been with her care providers since July 2021, since she was two months old, and they wished to adopt her. She was reported to feel safe, happy, and adapted to her home environment. The care providers met all V.R.'s emotional and developmental needs and provided a healthy, nurturing environment. V.R. showed love and affection toward her care providers and appeared to have a parent-child bond with them. The report further indicated that father had visited V.R. consistently, but the visits had not resulted in V.R. developing a secure attachment to him. It was reported that V.R. "was observed to take her time entering the visitation room and although [father] would try to engage in play with [V.R.], she would slowly retreat to playing on her own." V.R. did not exhibit any emotional or behavioral issues when visits ended.

On September 19, 2023, father filed a section 388 petition requesting the juvenile court return V.R. to his care. For changed circumstances, father alleged:

> "Since the termination of [father's] family reunification services [father] has participated and completed a sober living program where he reconnected with his faith and belief in the Lord and learned coping skills to address his substance abuse issues that contributed to his daughter being removed from his care."

Father alleged the requested order was in V.R.'s best interest because:

"[Father] has been a constant figure in [V.R.'s] life since she was born. As her biological father he has provided the love that only a father can have for his daughter and he is pledging to spend the rest of life showing her the love and affection that only a father can give, while providing for her stability and well being as evidence[d] by the negative drug screenings he has received since his family reunification services were terminated."

In an attachment, father further alleged:

"In addition to the foregoing, [father] has shown an unwavering commitment to reunifying with his daughter. He has not missed any visitation and the visits go very well with his daughter visibly showing her happiness with being with her father. [Father] has secured childcare for [V.R.] once she is returned to his care and has maintained full-time and consistent employment as well as having a stable home. [Father] now attends church regularly and continues to work on his sobriety by participating in the counseling and fellowship program through his church. [Father] wants this court to know that being a good and loving father to [V.R.] [is] his driving force and if given the opportunity will devote the rest of his life to ensuring her a loving and stable home."

Attached to the petition were delivered service logs containing visit summaries of father and V.R.'s visits, undated proof of participation in a church rehab program starting December 24, 2022, a baptism certificate indicating father was baptized on May 27, 2023, a daycare contract, payroll earnings records, and negative drug results from April and June 2023.

Minor's counsel and counsel for the agency both filed written oppositions to father's petition.

On October 12, 2023, the date set for the section 366.26 hearing, the juvenile court heard argument from the parties as to whether an evidentiary hearing should be held on father's section 388 petition. The court found the petition and evidence submitted did not set forth prima facie evidence of changed circumstances nor that the request would be in the best interests of V.R. and denied an evidentiary hearing on the petition.

6.

The juvenile court went on to conduct the section 366.26 hearing.  Father contested the agency's recommendation.  He called the case-carrying social worker who testified she had not personally observed any supervised visits between father and V.R.  On cross-examination, the social worker testified father had missed his August and September visits and had not visited V.R. since July.

Father testified on his behalf.  He stated he missed visits because he was unable to get a hold of his new social worker.  He further testified his visits with V.R. were "excellent."  He would change her, feed her, bring her new toys, and play with her.  They exchanged many hugs and kisses.  In the first few minutes of a visit, she was a bit shy but then would be happy with all her toys.  During the last visit, she did not want to leave the visit, and it took several minutes to get her to leave.  Father testified he had a strong bond with V.R.  When asked if termination of his parental rights would be detrimental for V.R., he stated it would be difficult for him if he were never to see her again, and she "wouldn't have the love of her father."  He further testified that V.R. was very happy when she was with him and that "no one is going to be able to love her and give her the love like her real father can."

Counsel for the agency and minor's counsel argued the court should follow the agency's recommendation.  Father's counsel asked the court to order a plan of legal guardianship.

The juvenile court found by clear and convincing evidence that V.R. was likely to be adopted.  The court further found that though he had missed some visits, father maintained regular visitation and contact with V.R. overall, and the visits went well and had been appropriate.  The court further found that V.R. and father did not have a substantial, positive, emotional attachment, citing the fact that V.R. was observed to delay entering the visitation room with father and would often slowly back off and play on her own, that V.R. referred to her care providers as "Papa" and "Mama," and there was no

7.

evidence to show that V.R. considered father anything more than a playmate she was happy to see. The court noted father's testimony that only he could give her the love she needed was "not evidence that would allow the Court to make a finding that there is such a bond at the level of substantial positive emotional attachment, that the child would continue to benefit from having a relationship with this father." The court further found that V.R., who the court noted had been out of father's custody since she was less than 30 days old, would not suffer detriment if the relationship were to be terminated. The court concluded for those reasons that the parent-child relationship exception did not apply. The court ordered parental rights to be terminated and that the permanent plan for V.R. was adoption.

**DISCUSSION**

## I.     Section 388 Petition

A parent petitioning the court to modify a prior dependency order pursuant to section 388 must show the existence of changed circumstances or new evidence justifying the proposed change and that the proposed change is in the best interests of the child. (§ 388; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) A parent need only make a prima facie showing of these elements to trigger the right to an evidentiary hearing, and courts must liberally construe a section 388 petition in favor of its sufficiency. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310 (*Marilyn H.*).) "However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) In determining whether the petition makes the necessary

8.

showing, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.)

After reunification services have been terminated, to make a showing of changed circumstances, the problem that initially brought the child within the dependency system must be removed or ameliorated. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) The change must be "substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

Further, at that point in the proceedings, a parent's interest in the care, custody, and companionship of the child is no longer paramount. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) The focus has shifted from family reunification to stability and permanence for the child. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) Accordingly, after a parent fails to reunify with a child and a permanent plan of guardianship has been ordered, "the court must turn its focus to the child's best interests, rather than the parent's, in deciding issues that may arise." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1559.) There is a rebuttable presumption that continued out-of-home placement is in the best interest of the child. (*Marilyn H.*, at p. 310.)

We review the juvenile court's summary denial of father's section 388 petition for abuse of discretion. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)[3] The denial must

---

[3] We reject father's assertion that whether a section 388 petition makes a prima facie showing so as to require an evidentiary hearing is a question of law to be reviewed de novo. Father cites no authority to support this assertion and ignores the well-established authority that the order is reviewed for abuse of discretion.

We similarly reject father's other contention that a de novo standard is required because his constitutional due process rights have been implicated. The statutory requirement that a juvenile court review a petition for a prima facie showing is a built-in safeguard for a parent's due process rights. As such, where a juvenile court finds a section 388 petition does not make a prima facie showing, and such a finding is not an abuse of discretion, there is no due process violation. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 459–460 [§ 388 statutory scheme requiring the juvenile court to hold a hearing when a prima facie showing is made is constitutional; a court's summary denial of a § 388 petition is reviewed for abuse of discretion].) Where, on the other hand, a

be upheld unless we can determine from the record that the juvenile court's decision "exceeded the bounds of reason by making an arbitrary, capricious or patently absurd determination." (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) When two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

Applying these principles, we conclude the juvenile court did not abuse its discretion in determining father's petition had not made a prima facie showing that return to him was in V.R.'s best interest. V.R. was removed from the parents' custody as an infant and lived with the same care providers for approximately two years. They were the only home she knew and, by all accounts, she was stable and happy, and her care providers wished to adopt her. Father's petition set forth facts supporting that he was working on his sobriety and that he was logistically capable of receiving V.R. into his home. However, father did not allege any specific facts *pertaining to V.R.* or her circumstances as to why a disruption to her positive, stable, and likely permanent home was in her best interest, besides perhaps, father's allegation that he was her natural father.

The court's determination such an allegation was not sufficient to justify an evidentiary hearing was reasonable. The authority father cites in his briefing regarding the significance of the relationship between a natural parent and child and general goals of dependency to preserve that relationship is not persuasive, as father ignores the well-established shift in focus after reunification services have been terminated away from reunification towards stability and permanence for the child. We reject father's suggestion that the court engaged in any "social engineering" in denying his petition.

---

court's summary denial of a section 388 petition is determined by a reviewing court to be an abuse of discretion, the proper remedy is remand for an evidentiary hearing. (*Id*. at p. 461.)

The record overwhelmingly supports the court's finding that V.R.'s best interests were best served by staying with her care providers was based on an individualized analysis of the circumstances of V.R., not an "arbitrary determination … that one family is better for the minor than another" based on socioeconomic standards. (See *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 606–607.)

For the foregoing reasons, we find no abuse of discretion. The juvenile court did not err by finding father's allegations insufficient to rebut the presumption that out-of-home placement was in V.R.'s best interests given the shift in focus from reunification to V.R.'s interest in stability and permanence at the section 366.26 stage of the proceedings.

Because the court's ruling was within its discretion, we find no due process violation.

## II. Beneficial Parent-Child Relationship Exception

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

A parent seeking to establish the beneficial parent-child relationship exception applies has the burden to prove by a preponderance of the evidence three elements to justify the application of the beneficial parent-child relationship exception: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the

relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 632–633, 636–637 (*Caden C.*).)

In determining the second element—whether the children would benefit from continuing the relationship because the child has a substantial, emotional, positive attachment to the parent—the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In determining the third element, courts look at "whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid.*) Courts may consider whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

We review the first two elements—whether the parents regularly and consistently visited and whether a beneficial relationship exists—for substantial evidence and the third element—whether "terminating that attachment would be detrimental to the child

even when balanced against the countervailing benefit of a new, adoptive home"—for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.) Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Id*. at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)[4]

Here, the juvenile court's finding that father and V.R. did not have a substantial, positive, emotional attachment was supported by substantial evidence. V.R. was extremely young when she was removed from the parents. By the time the section 366.26 hearing took place, V.R. was only visiting with father once per month and, because he missed the two visits prior to the hearing, she had not seen him in some time. Despite this, V.R. was reported as doing well and appearing happy in her care provider's home. There was no evidence that she was in distress being away from father or that she relied on him for any type of particular support. The court could reasonably rely on this to determine V.R. did not have the type of substantial, positive, emotional attachment that would justify application of the beneficial parent-child relationship exception. In

---

[4] The *Caden C.* court explained " 'there likely will be no practical difference in application of the two standards,' " but "[a]t its core, the hybrid standard we now endorse simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

13.

contrast, father's love for V.R. and their positive interactions during their visits did not compel the juvenile court to find a significant, positive, emotional attachment existed. While V.R. did appear to be happy in visits with father, the agency's reports indicated she tended to be shy towards him and played separately and did not show distress when visits ended. In addition, father did not make any showing that termination of his relationship with V.R. would cause any significant harm.

Father's suggestion that the juvenile court was required to order a bonding study sua sponte is unsupported by any authority. In support of his contention, he cites a portion of *Caden C.* where our Supreme Court advised trial courts to " 'seriously consider, where requested and appropriate, allowing for a bonding study….' " Expressly in the quote cited by father is the condition that the bonding study be "*requested*" and there was no such request made in the present case, which father concedes. Father also relies on *In re M.G.* (2022) 80 Cal.App.5th 836 (*M.G.*) to support his contention that this court should direct the juvenile court to order a bonding study, but *M.G.* is inapposite and does not assist father. In *M.G.*, the appellate court reversed an order terminating parental rights and remanded the matter for a new hearing where the parents *had requested* a bonding study, which the court relied on to determine whether the beneficial parent-child relationship exception applied. The appellate court concluded the bonding study was "inexplicably terse and analytically uninformative," given some of the particular circumstances of the case and that it engaged in improper comparison between the parents and the child's current caregivers and failed to evaluate the emotional bond between the parents and the child. (*Id*. at pp. 845, 849–851.) *M.G.* in no way stands for the proposition that father suggests it does—that we must direct the juvenile court to order a bonding study where none was requested below.

Finally, father contends the juvenile court failed to apply the principles set forth in *Caden C.* We reject father's contention. To support his contention that the matter must

14.

be remanded for consideration of the issues in light of *Caden C.*, father relies on cases where parents appealed from orders terminating parental rights made before *Caden C.* was decided, which are inapposite and unpersuasive given the procedural stance of the present case. (*In re J.D.* (2021) 70 Cal.App.5th 833; *In re B.D.* (2021) 66 Cal.App.5th 1218.) The juvenile court here was well aware of *Caden C.*, demonstrated by the fact the hearing was conducted two years after it was decided and that the court accurately set forth the law in its ruling. Father has established no basis to remand the matter for the court to conduct further analysis.

For the foregoing reasons, we find the juvenile court did not err in declining to apply the beneficial parent-child relationship exception to termination of parental rights.

## DISPOSITION

The juvenile court's October 12, 2023 orders are affirmed.